**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| THOMAS L. PAYNE, SID ARCHINAL, GARY H. KARESH, JO ANN KARESH, BELCA D. SWANSON AND MERLE K. SWANSON, individually, and on behalf of all others similarly situated, | ) ) ) ) ) ) | MISC No. 06-mc-00106 JJF THE UNITED STATES DISTRICT COURT FOR THE |
| Plaintiffs, v. | ) ) ) ) | WESTERN DISTRICT OF PENNSYLVANIA |
| ANTHONY J. DeLUCA, HARRY J. SOOSE, FRANCIS J. HARVEY, JAMES C. McGILL, RICHARD W. POGUE, DANIEL A. D'ANIELLO, PHILLIP B. DOLAN, E. MARTIN GIBSON, ROBERT F. PUGLIESE, JAMES DAVID WATKINS, and THE CARLYLE GROUP, | ) ) ) ) ) ) ) ) | CA No. 02-1927 |
| Defendants. | ) ) ) ) | |

**REPLY BRIEF IN SUPPORT OF THE MOTION OF**
**THE TRUSTEE OF THE IT LITIGATION TRUST TO QUASH SUBPOENA**

Dated: June 29, 2006

THE BAYARD FIRM
Jeffrey M. Schlerf (No. 3047)
Edmond D. Johnson (No. 2257)
Eric M. Sutty (No. 4007)
222 Delaware Avenue, Suite 900
Wilmington, Delaware 19801
(302) 655-5000

-and-

John K. Cunningham, Esquire
Matthew J. Feeley, Esquire
WHITE & CASE LLP
Wachovia Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
(305) 371-2700

Counsel to the Trust

## TABLE OF CONTENTS

Page

SUMMARY OF ARGUMENT ........................................................................1

ARGUMENT ...................................................................................................3

I.    THE SUBPOENA SHOULD BE QUASHED BECAUSE IT IS MOOT.................................................................................................3

II.    QUASHING THE SUBPOENA WILL BE IN ACCORD WITH THE WESTERN DISTRICT COURT'S MEMORANDUM ORDER .......................................................................................5

    A.  QUASHING THE SUBPOENA DOES NOT VIOLATE THE LAW OF THE CASE DOCTRINE .......................................7

    B.  QUASHING THE SUBPOENA DOES NOT VIOLATE THE DOCTRINE OF COMITY .................................................8

III.    AN INDEPENDENT BANKRUPTCY COURT'S CONSIDERATION OF A RETENTION PLAN HAS NO BEARING ON THE CONTINUED VALIDITY OF THE SUBPOENA .........................................................................9

IV.    THE SUBPOENA SHOULD BE QUASHED BECAUSE IT IMPOSES AN UNDUE BURDEN ON THE TRUST ...........................10

    A.  THIS COURT, AS THE COURT THAT ISSUED THE SUBPOENA, IS VESTED WITH EXCLUSIVE POWER TO ASSESS THE BURDEN IMPOSED ON THE TRUST BY THE SUBPOENA...........................................................10

    B.  THE BURDEN IMPOSED BY THE SUBPOENA IS SUBSTANTIALLY INCREASED BECAUSE THE TRUST WAS A NON-PARTY TO THE SECURITIES LITIGATION ..........11

    C.  THE SUBPOENA IS UNDULY BURDENSOME BECAUSE THE TRUST DOES NOT HAVE THE FINANCIAL RESOURCES TO SHOULDER THE SUBSTANTIAL COST OF PRESERVING THE DOCUMENTS FOR THE DISMISSED SECURITIES LITIGATION .........................................13

V.    THE SUBPOENA SHOULD NOT BE USED FOR OTHER LITIGATION...........................................................................15

CONCLUSION.................................................................................................17

## TABLE OF AUTHORITIES

Cases                                                                    Page

*Beshili v. Dep't of Homeland Sec.*,
    272 F. Supp.2d 514 (E.D.Pa. 2003) ......................................................................7

*Blair v. Willis*,
    112 Fed. Appx. 546, 547 (8th Cir. 2004)............................................................4

*Cash Today at Texas, Inc. v. Greenberg*,
    2002 WL 31414138 .........................................................................................11

*Christianson v. Colt Indus. Operating Corp.*,
    486 U.S. 800 (1988)............................................................................................7

*City of El Paso, Texas v. S.E. Reynolds*,
    887 F.2d 1103 (D.C. Cir. 1989)....................................................................3, 4, 5

*Corpening v. Leder*,
    2006 WL 322606 (W.D.N.C. 2006) ...................................................................3

*Lopez Contractors, Inc. v. F&M Bank Allegiance*,
    90 Fed. Appx. 549 (D.C. Cir. 2004) ...............................................................3, 4

*McCook Metals LLC v. Alcoa, Inc.*,
    249 F.3d 330, 334 (4th Cir. 2001) .....................................................................4

*Munz v. Parr*,
    972 F.2d 971, 973 (8th Cir. 1992) .....................................................................4

*In re Sealed Cases*,
    141 F.3d 337 (D.C. Cir. 1998).............................................................................8

*Sullivan v. Dickson*,
    283 F.2d 725, 727 (9th Cir. 1960) .....................................................................4

*Thomas v. Bible*,
    983 F.2d 152 (9th Cir. 1993) .............................................................................7

*United States v. Amerigroup Illinois, Inc.*,
    2005 WL 3111972 (N.D.Ill. 2005) ..............................................................12, 15

*Wyo. v. Okla.*,
    129 P.U.R. 4th 446 (1992)...................................................................................7

<span style="text-align:center">**TABLE OF AUTHORITIES** (continued)</span>

Statutes                                                                    Page

FED. R. CIV. P. 17-24 ...................................................................................12

FED. R. CIV. P. 26........................................................................................11

FED. R. CIV. P. 26(b)(2) ........................................................................10, 15

FED. R. CIV. P. 27........................................................................................4, 5

FED. R. CIV. P. 45................................................................................5, 11, 12

FED. R. CIV. P. 45(c)(1)................................................................................15

FED. R. CIV. P. 45(c)(3)(A) ........................................................................8, 10

FED. R. CIV. P. 45(c)(3)(A)(iv).....................................................................15

## SUMMARY OF ARGUMENT

In opposition to the Trustee's Motion to Quash the Subpoena[1] the Plaintiffs' and Defendants' (hereafter, the "Respondents") to the Securities Litigation jointly argue in their Joint Answering Brief to Motion of the Trustee of the IT Litigation Trust to Quash Subpoena ("Answering Brief") that the Subpoena should be allowed to go forward indefinitely, albeit the litigation that led to its issuance has been dismissed with prejudice. The Subpoena, however, is clearly now not required for discovery in the now-decided case that required its issuance and must therefore be quashed because it is moot and because its continued indefinite existence causes an undue burden for the Trust.

First, the Respondents argue, without a shred of case law support, that because the Plaintiffs' to the Securities Litigation have filed a motion for reconsideration that the Western District Court retains jurisdiction over the Securities Litigation and that the Subpoena cannot be mooted. This argument flies in the face of case law holding that discovery subpoenas are mooted when the underlying litigation is decided – and that this mooting must be recognized even if the underlying litigation is appealed.

Respondents' arguments regarding comity and the law of the case cannot possibly change this result as the Subpoena is in accord with the precise terms of the Memorandum Order, by which the Western District Court ordered that the Subpoena remain in effect for a limited time while the Defendants' motion to dismiss the Securities Litigation was pending. On May 2, 2006 the Western District Court granted Defendants' motion to dismiss with prejudice. Therefore, because the litigation that gave rise to the

---

[1] All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Opening Brief in Support of the Motion of the Trustee of the IT Litigation Trust to Quash Subpoena.

Subpoena has had a final disposition, the Subpoena is no longer required for discovery purposes and must be quashed as moot.

Even if the Subpoena is not moot because the underlying litigation has been decided, it must be quashed because of the undue burden the Subpoena imposes on the Trust. The Trust's limited funding resources cannot continue paying for the Subpoena's overbroad and open-ended obligations to maintain over 113,000 containers of documents in 45 different locations indefinitely. This continuing burden imposed on the Trust, a non-party to the Securities Litigation, costs the trust approximately $30,000 a month.

Lastly, the Respondents instruct this Court that it should allow the indefinite continuation of the Subpoena to protect discovery efforts in other litigations that are unrelated to the Securities Litigation. This argument too must fail, as this Court's consideration of the purpose and reasonableness of the Subpoena is properly constrained to a review of the discovery needs of the only litigation for which the Subpoena was issued – the now dismissed Securities Litigation.

## ARGUMENT

### I.    THE SUBPOENA SHOULD BE QUASHED BECAUSE IT IS MOOT

The Subpoena must be quashed as moot because subsequent to its issuance the litigation that required it – the Securities Litigation – was dismissed with prejudice, with the Western District Court directing the Clerk to close the proceedings (Ex. A)[*Payne* Docket No. 124]. In an attempt to overcome this rule of law, in their Answering Brief the Respondents argue, without any legal authority, that the Subpoena is not moot because Plaintiffs have filed a motion for reconsideration with the Western District Court in the Securities Litigation. (Answering Br. at 7-9).

While the Western District Court certainly has the power to decide Plaintiffs' motion for reconsideration, the Subpoena remains mooted, even with the filed motion, because the litigation that required its issuance was dismissed and the case has been ordered closed. Under these circumstances, the case law is clear that the Subpoena is moot. *See e.g,. Corpening v. Leder*, No. 5:05 CV 24, 2006 WL 322606, at * 6 (W.D.N.C. Feb. 9, 2006) (denying motion to enforce subpoena because case was dismissed and subpoena and motion were rendered moot by the dismissal); *City of El Paso, Texas v. S.E. Reynolds*, 887 F.2d 1103, 1106 (D.C. Cir. 1989) (discovery subpoenas were quashed as moot because underlying litigation was dismissed); *Lopez Contractors, Inc. v. F&M Bank Allegiance*, 90 Fed. Appx. 549, 550 (D.C. Cir. 2004) (quashal of subpoena on mootness grounds affirmed because underlying action was dismissed).

Conspicuously, the Respondents are unable to direct this Court to *a single case* where a subpoena remained in force subsequent to dismissal of the underlying litigation by virtue of a party filing a motion for reconsideration or because a court has otherwise

3

retained jurisdiction.[2]    (Answering Br. at 7-9).    Instead, the Respondents attempt to distinguish the case law which compels the quashing of the Subpoena under the facts of this case by arguing that in each of the cases cited by the Trustee the discovery subpoenas were quashed because the courts were "divested of jurisdiction, either through an entry of final judgment terminating the court's jurisdiction or otherwise." (Answering Br. at 8). But again, Respondents can find no support for their argument.

In fact, none of the cases cited by the Trustee in its Opening Brief hold that a subpoena is moot because a court entered final judgment or was otherwise divested of jurisdiction.    (Opening Br. at 6-7 (*Blair v. Willis*, 112 Fed. Appx. 546, 547 (8th Cir. 2004); *McCook Metals LLC v. Alcoa, Inc.*, 249 F.3d 330, 334 (4th Cir. 2001); *Sullivan v. Dickson*, 283 F.2d 725, 727 (9th Cir. 1960); *Munz v. Parr*, 972 F.2d 971, 973 (8th Cir. 1992); *Lopez v. F&M Bank*, 90 Fed. Appx. 549, 550 (D.C. Cir. 2004);  *El Paso,* 887 F.2d at 1105)).    Rather, each of these cases stands for the proposition that when an underlying case is decided (or even accepted for appeal), any discovery subpoenas issued for the original underlying case are mooted.    See id.

Further, Respondents argue that an appeal in the underlying case would automatically revive the Subpoena.    (Answering Br. at 9 (citing *El Paso*, 887 F.2d at 1105)).    This is a misrepresentation of the case law.    *El Paso* makes clear that to issue a deposition subpoena pending an appeal, a party must make a particularized "real showing of the need," pursuant to F.R.C.P. 27, with leave of the trial court.    *Id.; see also* Fed. R.

_____

[2] The cases cited by the Respondents regarding jurisdiction have nothing to do with the mooting of a subpoena after the underlying litigation is dismissed.  (Answering Br. at n.2 (*Ford Motor Company v. Summit Motor Products, Inc.*, 930 F.2d 277, 282 (3rd Cir. 1991); *Mondrow v. Fountain House*, 867 F.2d 798, 799 (3rd Cir. 1989); *Cohen v. Federal Deposits Ins. Co.*, 2003 WL 21419155 at *1 (E.D. Pa.); *Construction Aggregates, Ltd v. Joseph Paolino & Sons, Inc.*, 1991 WL 206751 at *1 (E.D. Pa); *Non-Punitive Segregation Inmates of Holmesburg Prison v. Kelly*, 589 F.Supp. 1330, 1336 (E.D. Pa. 1984)). The only cases cited by either the Trustee or the Respondents addressing the mooting of a subpoena when the underlying litigation is decided were cited in the Trustee's Opening Brief.  (Opening Br. at 6-7).

4

Civ. P. 27. *El Paso* only reinforces that once a case ends with a dismissal, even with a possibility of appeal, discovery obligations and discovery subpoenas lose effect. *Id.* Here, the case that required the Subpoena has been dismissed with prejudice and therefore, the Subpoena must be quashed as moot.

## II.    QUASHING THE SUBPOENA WILL BE IN ACCORD WITH THE WESTERN DISTRICT COURT'S MEMORANDUM ORDER

Although the Respondents must concede that the exclusive power to quash the Subpoena lies solely with this Court by virtue of F.R.C.P. 45, they argue that the Subpoena should not be quashed because doing so would contradict the Memorandum Order issued by the Western District Court. (Answering Br. at 9-10). In making this argument, the Respondents are forced to ignore the actual statements made by the Western District Court in the Memorandum Order. (Id.). The quashal of the Subpoena not only is consistent with the Memorandum Order, but is actually anticipated by that Order.

First, as described in detail in the Opening Brief, the Western District Court expressly stated that it intended that the Subpoena would only be in effect for a "short period of time" and "less than one month" while it decided Defendants' motion to dismiss. (Opening Br. at 7 (citing Memorandum Order at 14)). In their Answering Brief, the Respondents do not address how this Court's quashing of the Subpoena could possibly conflict with these statements made by the Western District Court now that Defendants' motion to dismiss has been granted in the Securities Litigation.

Moreover, when authorizing the issuance of the Subpoena for the Securities Litigation, the Western District Court gave a clear limiting mandate. (Memorandum Order at 9). The Western District Court in the December 23, 2005 Memorandum Order

5

began by clearly defining the underlying conditions to the issuance of the Subpoena, which the Respondents must concede no longer exist.  The Western District Court stated:

> [w]e begin our analysis with the recognition that whatever action this Court takes is entirely contingent on the assumptions that (1) at its hearing in mid-January 2006, the bankruptcy court will approve the Trust's plan to begin destroying documents as of January 31, 2006; and (2) destruction will begin immediately thereafter in an as-yet-undisclosed manner which will negatively affect both Plaintiffs and Defendants.  We also begin with the assumption that Defendants' Motion to Dismiss the Second Amended Complaint will be decided by this Court within the next 60 days.

Memorandum Order at  9.

Because these underlying conditions are no longer present, quashing the Subpoena will conform with the stated intent of the Western District Court when it authorized the Subpoena.  First, on May 2, 2006 (8 weeks ago) the Western District Court decided the motion to dismiss, dismissing the Plaintiffs' complaint with prejudice.  As the cited case law demonstrates, *see supra* at 3-5, this event renders the Subpoena moot as the only litigation requiring the issuance of the Subpoena is not longer in existence.  Second, at the hearing where the Western District Court heard arguments concerning the Subpoena – to which the Trustee was not invited to attend – the Respondents convinced the Western District Court that a bankruptcy court was about to approve a document retention plan regarding the documents covered by the Subpoena.   In reality, no bankruptcy court ever approved such a plan.  Third, the Trustee has not destroyed any documents.  Thus, all three preconditions the Western District Court established for the Subpoena no longer exist.  Because, by including these limiting conditions the Western District Court did not intend that the Subpoena be, as the Respondents' interpretation maintains, of indefinite duration, now that the conditions do not exist, quashing the Subpoena is in accord with the limiting nature of the  Memorandum Order.

**A.    Quashing the Subpoena Does Not Violate the Law of the Case Doctrine**

The Respondents' argument that the law of the case doctrine works to prevent the Court from quashing the Subpoena is misplaced.  (Answering Br. at 9-10).  As a threshold matter, the doctrine only applies "when a court decides upon a rule of law." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988) (emphasis added) (citing *Ariz. v. Cal.*, 460 U.S. 605, 618 (1983)).  Here, the Memorandum Order does not decide a rule of law, it simply authorizes a discovery subpoena.  Moreover, the law of the case doctrine is inapplicable here because the Trustee is not requesting that this Court overturn or even revisit a prior court ruling.  (Opening Br. at 6-8).  As described, *supra*, at 5-6, the Trustee is asking the Court from which the Subpoena was issued to take action entirely consistent with the unambiguous language of the Western District's Memorandum Order authorizing the Subpoena.  (Id. at 7-8).  The Memorandum Order language is clear that the Western District intended the Subpoena to be operative only for a "brief period of time" while the Defendants' motion to dismiss was pending.[3] Memorandum Order at 14.  Because that motion has now been decided, the Subpoena should be quashed.

_____

[3] Further, even if the law of the case doctrine was somehow relevant at this point, the well-recognized change of circumstances exception to the doctrine would apply to distinguish the motion to quash. *See e.g., Beshili v. Dep't of Homeland Sec.*, 272 F. Supp. 2d 514, 521 (E.D.Pa. 2003) (an intervening change in circumstances gives courts discretion to reopen a previously resolved question); *Wyo. v. Okla.*, 129 P.U.R. 4th 446, 112 S.Ct. 789 (1992); *Thomas v. Bible*, 983 F.2d 152, 155 (9th Cir. 1993).  The circumstances have completely changed since the Memorandum Order was rendered, the most important change being the dismissal of the Securities Litigation.

**B.**    **Quashing the Subpoena Does Not Violate the Doctrine of Comity**

The Respondents' assertion that the doctrine of comity prevents this Court from quashing the Subpoena is also misplaced.  (Answering Br. at 10).[4]  A court order authorizing a party to seek discovery, as we have here with the Memorandum Order, does not give the discovering party free reign to trample over the rights of others.  In fact, exclusive power to evaluate whether discovery subpoenas should be quashed or modified is vested with this Court – the court from which the Subpoena issued – and not with the court hearing the underlying litigation. Fed. R. Civ. P. 45(c)(3)(A)("the court from which a subpoena was issued shall quash or modify the subpoena …").  Indeed, the Federal Rules were specifically designed to enable a third party to seek discovery protection from a court within its own district.  *See In re Sealed Cases*, 141 F.3d 337, 341 (D.C. Cir. 1998) ("It may well be true, as respondent suggests, that the trial court will be better able to handle discovery disputes.  But Congress in the Rules has clearly been ready to sacrifice some efficiency in return for territorial protection for nonparties.")

Thus, even if the Memorandum Order is somehow at odds with now quashing the Subpoena (which it is not), this Court is not precluded by comity from applying well recognized discovery principles to quash a moot and unduly burdensome subpoena.  To the contrary, that is precisely what is expected of this Court.

---

[4] Notably, Respondents fail to offer any case law indicating that the doctrine of comity should apply to an issuing court's independent analysis of a discovery subpoena served to an entity over which it holds personal jurisdiction.  (Answering Br. at 10).  The only case offered by the Respondents is a transfer case. (*See id.*).

III.    **AN INDEPENDENT BANKRUPTCY COURT'S CONSIDERATION OF A RETENTION PLAN HAS NO BEARING ON THE CONTINUED VALIDITY OF THE SUBPOENA**

The Respondents attempt to shift this Court's focus by arguing that an independent bankruptcy court's consideration of a document retention plan addressing some of the documents covered by the Subpoena somehow justifies the indefinite existence of the Subpoena. (Answering Br. at 10-13). The Respondents would have this Court believe that a bankruptcy court's prior consideration of a proposed document retention plan, coupled with the Trustee's current motion to quash the Subpoena before this Court, somehow reflects the Trustee's diabolical plot to destroy evidence. (See id.). This fantastic allegation is false.[5]

While a bankruptcy court's independent consideration of a document retention plan for an entirely different litigation cannot have bearing on the continued operation of a Subpoena that was not issued in connection with that litigation, the Trustee wants to make abundantly clear its intention regarding discovery obligations. Since the beginning of its involvement with the Trust, the Trustee intent has been to provide notice to all interested parties before attempting to discard any documents – which its proposed document retention plan before the bankruptcy court intended to do. To be clear, going forward the Trustee intends to fulfill its discovery obligations as they pertain to documents in the bankruptcy case and every other case to which it is a party or from which the Trustee has been served with a discovery subpoena.

---

[5] If the Respondents wish to pursue a subpoena in a bankruptcy action, they are certainly free to do so, but in focusing here upon the proposed document retention plan in another litigation, they are arguing before the wrong court.

IV.    **THE SUBPOENA SHOULD BE QUASHED BECAUSE IT IMPOSES AN UNDUE BURDEN ON THE TRUST**

In the Answering Brief, the Respondents argue that the burden the Subpoena imposes cannot be undue because the Western District Court already analyzed the burden (Answering Br. at 13-14), the Trustee had notice of the proceedings before the Western District Court ( Answering Br. at 14-15) and the Trust has substantial financial resources to spend on preserving the documents (Answering Br. at 19-20). All of these arguments fail and cannot prevent a finding that the overbroad and indefinite Subpoena imposes a continuing undue burden when balanced against the fact that the Trust is a non-party to the underlying case that has been resolved by dismissal. *See* Fed. R. Civ. P. 26(b)(2) (when analyzing burden a court must weigh expense against the "importance of the proposed discovery in resolving the issues.").

A.    **This Court, as the Court that Issued the Subpoena, is Vested With Exclusive Power to Assess the Burden Imposed on the Trust by the Subpoena**

The Respondents' argument that the Subpoena does not impose an undue burden on the Trust because the Western District Court already decided the burden issue is both legally and factually inaccurate. (Answering Br. at 13-16). The law is clear that the power to evaluate the burden imposed by the Subpoena is only vested by the Federal Rules with the court that issues the Subpoena. Fed. R. Civ. Pro. 45(c)(3)(A)("[T]he court by which a subpoena was issued shall quash or modify the subpoena if it subject a person to undue burden."). Thus, whether the Western District Court considered the Subpoena to be reasonable when it ordered the Respondents to issue it from this Court, has no bearing on whether this Court now considers the burden imposed on the Trust to be undue. Id. This Court must evaluate the burden imposed by the Subpoena under all the

present circumstances, including the Trust's financial status and the fact that the underlying litigation has been dismissed with prejudice. Fed. R. Civ. P. 26; Fed. R. Civ. P. 45.

Moreover, a decision by this Court that the Subpoena is currently unduly burdensome does not conflict with comments made by the Western District Court. In fact, the Western District Court only found that the Subpoena would be not be unduly burdensome if it was limited in time to that court's decision on Defendants' motion to dismiss. (Memorandum Order at 14 ("the relatively light burden of complying [with the Subpoena] for the short period of time envisioned.")). In issuing the Memorandum Order, the Western District Court expressly stated that the Subpoena was then reasonable because it would only "postpone the starting date of [the Trust's] document retention plan <u>less than one month</u>." (Memorandum Order at n. 9) (emphasis added). Now, over six months later, circumstances have changed considerably and the continuing burden imposed on the Trust is now undue.

B.    **The Burden Imposed by the Subpoena is Substantially Increased Because the Trust was a Non-Party to the Securities Litigation**

The Respondents also argue that the Trust's non-party status is somehow irrelevant to the Court's inquiry here because the Trustee "chose" not to participate in the proceeding before the Western District Court that led to the issuance of the Subpoena. (Answering Br. at 2, 14-15). This is absurd. Whether the Trust had knowledge of the proceedings before the Western District Court does not change that the Trust's non-party status is undeniably a significant factor in determining whether the burden imposed by the Subpoena is undue. *See Cash Today at Texas, Inc. v. Greenberg*, 2002 WL 31414138

at * 1-5 (D.Del. 2002); *United States v. Amerigroup Illinois, Inc.*, 2005 WL 3111972 at * 2 (N.D. Ill. 2005).

Moreover, the Trustee was never invited to attend and be heard or otherwise given a "seat at the table" in the proceeding before the Western District Court. In mid-November 2005 the Trustee received via email a copy of Defendants' motion for a preservation subpoena and subsequently received on the afternoon of December 23, 2005 via email a copy of the Western District Court's Memorandum Opinion. The Trustee did not receive any other notice, including notice of a hearing, response deadline or the submission of a proposed subpoena.

Ignoring these facts, the Respondents criticize the Trustee for failing to "participate" in the proceedings before the Western District Court, (Answering Br. at 3), but the Respondents give no hint as to how they think the Trustee could have participated in the Securities Litigation. The Trust did not have a cognizable interest in the Securities Litigation simply because it may have possessed documents relevant to that litigation. Clearly the Trustee did not have grounds for joinder, interpleader or intervention in the Securities Litigation. Fed. R. Civ. P. 17-24.[6] Thus, the Trust's non-party status remains and important factor in assessing the burden imposed on the Trust by the Subpoena.

---

[6] Even now, the Respondents claim that the Trustee should object to the Subpoena with some type of filing before the Western District Court – even though the Trustee cannot be heard on this issue in that forum. (Answering Br. at 2). The Federal Rules are clear that objections to Subpoenas are to be considered by the court that issued the Subpoena, not by a court that heard the underlying litigation. Fed. R. Civ. P. 45.

**C.    The Subpoena is Unduly Burdensome Because the Trust Does Not Have the Financial Resources to Shoulder the Substantial Cost of Preserving the Documents for the Dismissed Securities Litigation**

Respondents attempt to trivialize the burden imposed by the Subpoena upon the Trust, alleging that the Subpoena cannot be unduly burdensome because the Trust allegedly has deep pockets and has not adequately described its financial burden. (Answering Br. at 19-21). The Respondents ignore the undisputable fact that the Trust inherited from the Debtors over 2 years ago more than 113,000 containers at 45 locations. (Ex. B (Henry R. Colvin Declaration) at ¶ 7). The shear volume of these documents are undeniably extremely expensive for the Trust to maintain indefinitely. (*Id.*). In fact, the preservation of these documents in satisfaction of the obligations imposed by the Subpoena costs the Trust approximately $30,000 each month. (*Id.*). Further, as explained below, and in the Trustee's Opening Brief, the Trustee's resources are specifically limited and continued compliance with the Subpoena is unduly burdensome because the Subpoena is overbroad and completely open-ended. (Opening Br. 8-13; *see also* Ex. B at ¶ 10, 11).

The great majority of the funds in the possession of the Trust, as required by the Court approved Bankruptcy Plan (the "Plan"), were vested in the Trust on the Effective Date and are earmarked for distribution to creditors – and cannot be spent on indefinite retention of millions upon millions of documents. (Ex. B at ¶ 8). As the Disbursing Agent under the Plan, the Trustee is required to hold in reserve such funds for specific classes of creditors pending the outcome of the claims reconciliation process. (*Id.* at ¶ 8).

13

These funds are <u>not</u> available to the Trustee for the general administration of the Trust, including monthly storage costs. (*Id.*)[7]

In addition, under the Plan, various causes of action vested in the Trust and any recoveries are for the benefit of (i) allowed unsecured claims, who are expected to receive a cumulative 1-2 percent distribution, and (ii) the secured lender claims, who are expected to received a cumulative 10-11 percent distribution. (*Id.* at ¶ 7). The creditors would be overjoyed if the Trustee recovered "tens of millions of dollars" as alleged by the Respondents. (Answering Br. at 20). In fact, the funds that the Trustee has collected are reserved for the benefit of these two classes of creditors and cannot be squandered, as the Respondents cavalierly suggest, for the indefinite preservation of documents based on a subpoena issued only in relation to a litigation that has been dismissed with prejudice. (*Id.*)

The Trust did receive the relatively modest amount of $1.5 million in funding on the effective date of the Plan, April 30, 2004. (Opening Br. at 11; Ex. B at ¶ 10). In addition to funding the prosecution of litigation and covering a multitude of administrative matters required of the Trustee under the Plan, this initial funding is what continues to pay for the preservation of the 113,000 containers of boxes covered by the Subpoena. (Ex. B at ¶ 10). Every day the Subpoena continues to require the preservation of the 113,000 boxes of documents for a litigation has been dismissed, causes the Trust to suffer an undue burden. (Ex. B at ¶ 10).

Here, the scope of the Subpoena is so vast that it clearly creates an undue burden for the Trust. As described in detail in the Trustee's Opening Brief, the documents

---

[7]  If this Court deems it necessary, the Trustee can provide supplemental information regarding the resources available to the Trustee.

sought to be preserved under the Subpoena are described in 78 paragraphs plus 18 pages of exhibits, without any time limitation.[8]   (Opening Br. at 9-10).   In their Answering Brief, the Respondents fail to address any of the examples of the unlimited, overbroad and burdensome categories of documents listed in the Subpoena and highlighted by the Trustee in the Opening Brief.  (Answering Br. at 19-21; Opening Br. at 9-10).

These undisputable facts demonstrate the very real burden imposed upon the Trust in continuing to comply with the Subpoena after the underlying action has been dismissed.   Therefore, besides the fact that the Subpoena is moot, it must be quashed because this burden is excessive and undue.  *See* Fed. R. Civ. P.  45(c)(3)(A)(iv); Fed. R. Civ. P. 26(b)(2); *Amerigroup*, 2005 WL 3111972, *2 ; *see also* Opening Br. At 8-13.

## V.    THE SUBPOENA SHOULD NOT BE USED FOR OTHER LITIGATION

In the Answering Brief the Respondents argue that the Subpoena should not be quashed because the documents it addresses may be relevant to other completely independent litigations. (Answering Br. at 1, 3 16-18).[9]  This argument must fail because the only issue before this Court is the validity of the Subpoena as it relates to the Securities Litigation.   As the Subpoena itself states, it was only issued to satisfy the discovery needs of the Securities Litigation. (*See* Ex. C).  Despite Respondents' bold

---

[8]  In their Answering Brief, for the first time the Respondents represent that they do not need documents dated before January 1, 1996. (Answering Br. at 20).  This admission, coupled with the Subpoena which fails to contain any time limitation, demonstrates that the Subpoena as written is overbroad.  By not including a time limitation that they now concede is reasonable, the Respondents admit that they failed to "to take reasonable steps to avoid imposing undue burden on a person subject to [a] subpoena. Fed. R. Civ. P. 45(c)(1).

[9]  Respondents cite to a case in the Western District of Pennsylvania, Glover v. DeLuca,, Case No. 03-00288, and a case in the District of Delaware, IT Litigation Trust v. D'Aniello et al., Case No. 04-CV-1268 and state that the Subpoena should not be quashed because the documents it preserves are relevant to these other litigations. (Answering Br. at 1,4,7).  This attempt to "bootstrap" the Subpoena should be denied as Respondents offer no explanation of why the documents would be relevant to Glover or D'Aniello, the Subpoena does not include Glover or D'Aniello as the litigations that require the preservation of documents (Ex. C), and the Western District Court's Memorandum Order does not mention Glover and D'Aniello. Clearly, the Subpoena was not issued to preserve documents for Glover and D'Aniello.

invitation for it to do so, it would be inappropriate for this Court to address real or potential discovery issues in other litigations in deciding this motion.   If the Respondents want to raise discovery issues in other matters, they need to address them within the procedural confines of those specific matters.

Moreover, contrary to what Respondents argue, this Court's quashing of the Subpoena as moot and unduly burdensome is not tantamount to an endorsement of some alleged conspiracy by the Trust to destroy documents relevant to other litigation. (Answering Br. at 16-17).  As the Trustee has stated on many occasions, it is fully aware of the Trust's discovery obligations in other litigations and intends to fully comply with those obligations.   By quashing the Subpoena issued solely in connection with the Securities Litigation, this Court will be addressing only that Subpoena and its existence for purposes of the Securities Litigation and will not in anyway modify the Trust's discovery obligations in other independent matters.   By quashing the Subpoena, this Court will not, as it cannot, be approving the destruction of documents for other litigations.

## CONCLUSION

For the foregoing reasons, the Trustee respectfully requests that this Court quash

the Subpoena.

Dated: June 29, 2006

THE BAYARD FIRM

By: _____

Jeffrey M. Schlerf (No. 3047)
Edmond D. Johnson (No. 2257)
Eric M. Sutty (No. 4007)
222 Delaware Avenue, Suite 900
Wilmington, Delaware 19801
(302) 655-5000

and

John K. Cunningham, Esquire
Matthew J. Feeley, Esquire
WHITE & CASE LLP
Wachovia Financial Center
200 South Biscayne Blvd.
Miami, Florida 33131
(305) 371-2700

Counsel to the Trust

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| THOMAS L. PAYNE, SID ARCHINAL, GARY H. KARESH, JO ANN KARESH, BELCA D. SWANSON AND MERLE K. SWANSON, individually and on behalf of all others similarly situated, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | <u>CLASS ACTION</u> |
| vs. | ) ) | CA No. 02-1927 |
| ANTHONY J. DeLUCA, HARRY J. SOOSE, FRANCIS J. HARVEY, JAMES C. McGILL, RICHARD W. POGUE, DANIEL A. D'ANIELLO, PHILLIP B. DOLAN, E. MARTIN GIBSON, ROBERT F. PUGLIESE, JAMES DAVID WATKINS, and THE CARLYLE GROUP, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

<u>ORDER OF COURT</u>

**AND NOW**, this 2ᵈ day of May 2006, upon consideration of the Motion to Dismiss the

Second Amended Complaint, filed at Docket No. 73,  it is **ORDERED** that the Motion is

**GRANTED** in its entirety.  Plaintiffs' Second Amended Complaint, Docket No. 70,  is dismissed

with prejudice.  The Clerk of Courts is hereby directed to mark the above-captioned case

"**CLOSED**" forthwith.

Arthur J. Schwab
United States District Judge

for

William L. Standish
United States District Judge

see attached distribution list

Kwasi Asiedu
Law Offices of Kwasi Asiedu
3858 Carson Street
Number 204
Torrance, CA 90503

Lionel Z. Glancy
Glancy & Binkow
1801 Avenue of the Stars
Suite 311
Los Angeles, CA 90067
Email: info@glancylaw.com

Michael Goldberg
Glancy & Binkow
1801 Avenue of the Stars
Suite 311
Los Angeles, CA 90067

Richard J. Pocker
Dickerson, Dickerson, Consul & Pocker
Rainbow Corporate Center
777 North Rainbow Boulevard
Suite 350
Las Vegas, NV 89107

Robert Zabb
Glancy & Binkow
1801 Avenue of the Stars
Suite 311
Los Angeles, CA 90067
Email: info@glancylaw.com

David A. Becker
Latham & Watkins
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
Email: david.becker@lw.com

Mark A. Willard
Eckert, Seamans, Cherin & Mellott
600 Grant Street
44th Floor
Pittsburgh, PA 15219

Robert V. Campedel
Eckert, Seamans, Cherin & Mellott
600 Grant Street
44th Floor
Pittsburgh, PA 15219

Charles A. DeMonaco
Dickie, McCamey & Chilcote
Two PPG Place
Suite 400
Pittsburgh, PA 15222-5402
Email: cdemonaco@dmclaw.com

Kimberly L. Haddox
Dickie, McCamey & Chilcote
Two PPG Place
Suite 400
Pittsburgh, PA 15222-5402
Email: khaddox@dmclaw.com

Richard J. Federowicz
Dickie, McCamey & Chilcote
Two PPG Place
Suite 400
Pittsburgh, PA 15222-5402
Email: rfederowicz@dmclaw.com

Brian D. Long
Chimicles & Tikellis
One Rodney Square
P.O. Box 1035
Wilmington, DE 19899

E. Powell Miller
Miller Shea
1301 West Long Lake Road
Suite 135
Troy, MI 48098

Steven A. Schwartz
Chimicles & Tikellis
361 West Lancaster Avenue
One Haverford Centre
Haverford, PA 19041

Thomas L. Patten
Latham & Watkins
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
Email: tom.patten@lw.com

Courtney S. Schorr
Latham & Watkins
555 Eleventh Street, N.W.
Suite 1000
Washington, DC 20004-1304
Email: courtney.schorr@lw.com

Larry K. Elliott
Cohen & Grigsby
11 Stanwix Street
15th Floor
Pittsburgh, PA 15222-1319
Email: lelliott@cohenlaw.com

Laurie B. Smilan
American Civil Liberties Union of Pennsylvania
P.O. Box 40008
Philadelphia, PA 19106
(703) 456-5220
Email: laurie.smilan@lw.com

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| THOMAS L. PAYNE, SID ARCHINAL, GARY H. KARESH, JO ANN KARESH, BELCA D. SWANSON AND MERLE K. SWANSON, individually, and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>ANTHONY J. DeLUCA, HARRY J. SOOSE, FRANCIS J. HARVEY, JAMES C. McGILL, RICHARD W. POGUE, DANIEL A. D'ANIELLO, PHILLIP B. DOLAN, E. MARTIN GIBSON, ROBERT F. PUGLIESE, JAMES DAVID WATKINS, and THE CARLYLE GROUP,<br><br>Defendants. | MISC No. 06-mc-00106 JJF<br><br>THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA<br><br>CA No. 02-1927 |

**DECLARATION OF HENRY R. COLVIN**
**IN SUPPORT OF THE MOTION OF THE TRUSTEE**
**OF THE IT LITIGATION TRUST TO QUASH SUBPOENA**

| | |
|---|---|
| STATE OF TEXAS | ) |
| | ) |
| CITY OF DALLAS | ) |

I, Henry R. Colvin, make this declaration pursuant to 28 U.S.C. § 1746:

1.    Pursuant to the First Amended Joint Chapter 11 Plan of The IT Group, Inc. and Its Affiliated Debtors Proposed by the Debtors and the Official Committee of Unsecured Creditors (the "Plan") confirmed by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), AlixPartners LLC ("AlixPartners" or the "Trustee") is the trustee of the IT Litigation Trust (the "Trust").

2.    I am a director of AlixPartners and familiar with the subject of the

Trustee's books and records and the Motion (defined below).

3.    This declaration is submitted in support of the Motion of the Trustee of The IT Litigation Trust to Quash Subpoena (the "Motion").

4.    By way of background, on April 25, 2002, the Bankruptcy Court entered an Order approving the sale (the "Sale") of substantially all of the Debtor's assets to The Shaw Group, Inc. ("Shaw"). The Sale closed on May 3, 2002.

5.    Pursuant to the Sale, Shaw took possession of various books and records of the Debtors, including records relating to projects assumed by Shaw pursuant to the Sale. However, the Debtors continued to hold a substantial portion of their books and records in various storage facilities across the country.

6.    On April 5, 2004, the Bankruptcy Court confirmed the First Amended Joint Chapter 11 Plan of The IT Group, Inc. and Its Affiliated Debtors Proposed by the Debtors and the Official Committee of Unsecured Creditors (as amended, the "Plan"). On April 30, 2004 (the "Effective Date"), the Plan went effective.

7.    Under the Plan, the Trust inherited the Debtors' book and records. Since the Effective Date over two years ago, the Trust has continued to retain these books and records, consisting of approximately 113,602 containers at 46 different locations maintained by 12 different storage companies. The Trust continues to pay approximately $30,000 per month, or $360,000 per year, to the storage facilities. The storage cost of these documents continues to be a significant burden on the Trust. Indeed, since the Effective Date the cumulative cost for this document storage is approximately $800,000.00.

8.    Most of the funds in the possession of the Trust were vested in the Trust

on the Effective Date and, as required under the Plan, are earmarked specifically for distribution to creditors. As the Disbursing Agent under the Plan, the Trustee is required to hold in reserve such funds for specific classes of creditors pending the outcome of the claims reconciliation process. These funds are <u>not</u> available to the Trustee for the general administration of the Trust, including monthly storage costs.

9.     In addition, under the Plan, various causes of action vested in the Trust and any recoveries are for the benefit of (i) allowed unsecured claims, who are expected to receive a cumulative 1-2 percent distribution, and (ii) allowed secured lender claims, who are expected to received a cumulative 10-11 percent distribution. Contrary to the Respondents' assertions, the Trustee has not recovered "tens of millions of dollars." In any event, the recoveries are specifically intended under the Plan for the benefit of these two classes of creditors.

10.     The Trust did receive the relatively modest amount of $1.5 million in initial funding on the Effective Date. In addition to funding the prosecution of litigation (over 1200 actions) and covering a multitude of administrative matters required of the Trustee under the Plan, this funding continues to be the source of payment for the preservation of the 113,000 containers of documents. Every day that the Trustee is required to preserve all these documents for litigation that has been dismissed cause the Trustee an undue burden.

11.     Under these circumstances it would be unduly burdensome for the Trust to be required to continue to preserve all of the documents described in the Subpoena.[1]

---

[1] If this Court deems it necessary, the Trustee can provide supplemental information regarding the resources available to the Trustee.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: June **29**, 2006

Henry Colvin

# EXHIBIT C

Issued by the
## UNITED STATES DISTRICT COURT

DISTRICT OF _____ DELAWARE

### SUBPOENA IN A CIVIL CASE

THOMAS L. PAYNE, et al.,
        Plaintiff,

   V.

ANTHONY J. DELUCA, et al.,
        Defendants.

Case Number: 02-1927
Western District of Pennsylvania

TO:   TRUSTEE OF THE IT GROUP LITIGATION TRUST
      C/O Jeffrey Schlerf, Esq., The Bayard Firm, 222 Delaware Ave., Suite 900, P.O. Box 25130
      Wilmington, DE 19899

☐ YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|

☒ YOU ARE COMMANDED to preserve the following documents or objects pending further court order:

**SEE EXHIBIT A ATTACHED HERETO**

| PLACE | DATE AND TIME |
|---|---|
| TO BE DETERMINED | TO BE DETERMINED |

☐ YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PREMISES | DATE AND TIME |
|---|---|

    Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| SEE SIGNATURE PAGE ATTACHED AS EXHIBIT B | FEBRUARY 15, 2006 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER

**SEE SIGNATURE PAGE ATTACHED AS EXHIBIT B**

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on Reverse)

RECEIVED

FEB 16 2006

JEFFREY M. SCHLERF

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | February 15, 2006 | The Bayard Firm,<br>222 Delaware Ave., Suite 900, P.O. Box 25130<br>Wilmington, DE 19899 |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| [PROVIDE] | BY HAND |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| [PROVIDE] | Attorneys for Plaintiffs Thomas L. Payne *et al.* |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____ February 15, 2006 _____

SIGNATURE OF SERVER

PROVIDE
ADDRESS OF SERVER

---

RULE 45, Federal Rules of Civil Procedure, Parts C&D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take responsible steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or copying or of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i)   fails to allow reasonable time for compliance,
(ii)  requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded

to travel from any such place within the state in which the trial is held, or

(iii)  requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv)  subjects a person to undue burden.

(B)  If a subpoena

(i)   requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii)  requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii)  requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d)      DUTIES IN RESPONDING TO SUBPOENA.

(1)  A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2)  When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim

A   3

# Exhibit A

## EXHIBIT A

## I. DEFINITIONS

As used herein, the words and phrases set forth below shall have the meaning or meanings prescribed for them:

1.    "And" shall include the term "or", and the term "or" shall include the term "and", such that each document request calls for the production of the greatest number of documents.

2.    "Any" shall mean any and all.  The term "all" has the same meaning.

3.    "Arthur Andersen" means Arthur Andersen LLP, or any of its subsidiaries, divisions, offices, affiliates, predecessors, successors, joint ventures, present and former partners, employees, representatives, agents, attorneys, and all other persons or entities acting or purporting to act on its behalf.

4.    Any reference to the "board of directors" shall refer to the board of directors of IT Group and shall also refer to any committee, subcommittee thereof, including but not limited to the audit committee or the executive committee.

5.    "Second Amended Complaint" means the Second Amended Complaint filed in *Payne v. DeLuca*, Civ. Action No. 02-1927(W.D. Pa.).

6.    "Communicate" or "communication(s)" refers to every manner or means of disclosure, transfer, provision, conveyance, or exchange of information or thoughts (in the form of facts, ideas, inquiries or otherwise), orally, written and/or electronically transmitted, including but not limited to any meeting or correspondence, formal or informal, in writing or electronic.

7.    "Concerning" means reflecting, relating to, referring to, describing, evidencing, constituting, reflecting, or logically or factually connected with the matter discussed.

8.    "Document(s)" has the same meaning as "writings," which is defined in Federal Rule

A    5

of Civil Procedure 34(a) and Federal Rule of Evidence 1001, and is used herein in the broadest possible sense and includes data, videotape and motion pictures, and electronic, mechanical or electric records or representations, including e-mail. "Document(s)" include, but are not limited to, correspondence, letters, contracts, agreements, memoranda, statements, bills, schedules, receipts, invoices, records of purchases or sale, brochures, projections, budgets, calendars, reports, studies, minutes, resolutions, due diligence files, promissory notes, loan documents, letters of credit, notes (handwritten or otherwise), messages, analyses, plans, evaluations, diaries, agendas, announcements, manuals, telephone message slips, telephone bills, telephone logs, telephone toll records, press releases, transcripts, scripts, graphs, charts, computer directories, computer disks, computer tapes, or any other written, printed, typed, taped, filmed, or graphic matter however produced or reproduced. "Document(s)" further includes non-identical copies, including, but not limited to, drafts, revisions, alterations, modifications, changes, markups, amendments of the foregoing or comments or notations appearing on the foregoing, which are not part of the original text. "Document(s)" also include the file, folder tabs, and labels appended to or containing any documents.

9.    "Ernst & Young" or "E&Y" means Ernst & Young LLP, or any of its subsidiaries, divisions, offices, affiliates, predecessors, successors, joint ventures, present and former partners, employees, representatives, agents, attorneys, and all other persons or entities acting or purporting to act on its behalf.

10.    "IT Group" or "the Company" means The IT Group, Inc., including predecessors and/or successors, subsidiaries, joint ventures, and/or affiliates, and any division and/or segments thereof, or any of its former or current officers, directors, employees, attorneys, partners, or any other person or entity acting on its behalf.

11.    "Kroll Zolfo Cooper" means Kroll Zolfo Cooper LLC or any of its subsidiaries,

A    6

divisions, offices, affiliates, predecessors, successors, joint ventures, present and former partners, employees, representatives, agents, attorneys, and all other persons or entities acting or purporting to act on its behalf.

12. "Meeting" means the contemporaneous presence of any natural persons (including by telephone) for any purpose, whether or not such presence was by chance or prearranged, and whether or not the meeting was formal or informal or occurred in connection with some other activity.

13. "Person" or "persons" refers to natural persons, proprietorships, governmental agencies, corporations, partnerships, trusts, joint ventures, groups, associations, organizations and all other entities.

14. "PWC" means PricewaterhouseCoopers or any of its subsidiaries, divisions, offices, affiliates, predecessors, successors, joint ventures, present and former partners, employees, representatives, agents, attorneys, and all other persons or entities acting or purporting to act on its behalf.

15. "Relate to", "related to", "relating to" or "regarding" means in any way to consist of, reflect, relate to, refer to, mention, describe, evidence, consider, discuss, contain, analyze, study, describe, pertain to, report on, be legally, logically or factually connected with, or reflect, in whole or part, directly or indirectly, a stated subject matter.

16. "SEC" means the United States Securities and Exchange Commission, or any of its present and former divisions, subdivisions, affiliates, employees, representatives, agents and all other persons acting or purporting to act on behalf of the foregoing.

A    7

## II. INSTRUCTIONS

This subpoena requires the preservation of documents rather than their production. The documents shall be preserved pending further court order in a manner consistent with their eventual production in accordance with the following instructions, including, for example, preservation of all non-identical copies and drafts, preservation of transmittal sheets, cover letters, exhibits, enclosures, or attachments, and preservation of files, envelopes, storage labels or other indicia of storage method, system, classification or index.

1.    The instructions set forth in Rules 26 (to the extent applicable) and 34 of the Federal Rules of Civil Procedure are incorporated herein by reference.

2.    The use of the singular shall be deemed to include the plural, the disjunctive shall include the conjunctive, and the use of masculine, feminine or neutral gender shall include each gender, as appropriate in context.

3.    The terms "all," "any," "each," and "every" shall each be construed as all, any, each and every to bring within the scope of the Request or Requests all information that might otherwise be construed to be outside of its scope.

4.    The terms "and" and "or" shall be construed disjunctively or conjunctively as necessary to bring within the scope of the Request all information that might otherwise be construed to be outside of its scope.

5.    These Document Requests are continuing in nature and require supplemental responses as specified in Federal Rule of Civil Procedure 26(e) if you (or any person acting on your behalf) obtain additional information called for by the requests between the time of the original response and the time set for trial. Each supplemental response shall be served on plaintiff no later than thirty (30) days after the discovery of the further information, and in no event shall any

—4—

supplemental response be served later than one week before the first day of trial.

6.    These document requests encompass any documents produced in any other action regardless of whether that case is active or inactive.

7.    In producing documents and other materials, you are requested to furnish all documents or things in your possession, custody or control, regardless of whether such documents or materials are possessed directly by you or your directors, officers, agents, employees, representatives, parents, subsidiaries, predecessors, successors, managing agents, divisions, affiliates, investigators, or by your attorneys, accountants, or their agents, employees, representatives or investigators. A document shall be deemed to be within your control if you have the right or practical ability to secure the document or a copy of the document, directly or indirectly, from another person having possession or custody of the document.

8.    If any part of a document is responsive to any request, the whole document is to be produced. Any alteration of a responsive document, including, but not limited to, any marginal notes, handwritten notes, underlining, date stamps, endorsed or filed stamps, drafts, revisions, modifications and other versions of a final document is a separate and distinct document and it must be produced.

9.    The fact that a document is produced by any other person does not relieve you of the obligation to produce your copy of the same document, even if the two documents are identical in all respects.

10.   If any requested document or thing cannot be produced in full, produce it to the extent possible, indicating which document or portion of that document is being withheld and the reason that document is being withheld.

11.   In producing documents, you are requested to produce the original of each document

A    9

requested together with all non-identical copies and drafts of that document. If the original of any document cannot be located, a copy shall be provided in lieu thereof, and shall be legible and bound or stapled in the same manner as the original.

12. Documents shall be produced as they are kept in the usual course of business. Each document shall be produced in such fashion as to indicate clearly the identity of the file in which such document was located and the configuration in which such document was kept. Therefore, all documents shall be produced in the file folder, envelope or other container in which the documents are kept or maintained by you. If, for any reason, the container cannot be produced, produce copies of all labels or other identifying marks.

13. Documents shall be produced in such fashion as to identify the department, branch or office in whose possession it was located and, where applicable, the natural person in whose possession it was found and the business address of each document's custodian(s).

14. Documents attached to each other should not be separated.

15. Electronic, computer or machine-readable data should be produced in an electronic form that does not require specialized or proprietary hardware or software. If you wish to provide electronic, computer or machine-readable documents in a form different from that described above, counsel for Plaintiffs and Defendants should be contacted to determine if the proposed format is appropriate.

16. Documents not otherwise responsive to this discovery request shall be produced if such documents mention, discuss, refer to or explain the documents which are called for by this discovery request, or if such documents are attached to documents called for by this discovery request and constitute routing slips, transmittal memoranda, letters, comments, evaluations or similar materials.

A    10

17.    Each request shall be construed independently and not with reference to any other Request for the purpose of limitation.

18.    A request for a document shall be deemed to include a request for any and all transmittal sheets, cover letters, exhibits, enclosures, or attachments to the document, in addition to the document itself.

19.    If there is no document responsive to any particular request, please so state in writing.

20.    In the event that you interpose an objection to the requests or a request, you should clearly indicate to which part or portion of the requests or request the objection is directed and provide all documents to which objection is not made as if such part or portion were propounded as a separate request.

21.    In evaluating whether any e-mail is responsive to the requests, you are to review the text of each individual e-mail (i.e. not simply review the subject heading or utilize an electronic search device). As the requests relate to web-sites and other electronic information, you are to review the electronic content posted on web-sites in your possession, custody or control (i.e. not simply review the subject heading or utilize an electronic search device).

22.    You are to preserve all electronic documents in your possession, which includes discontinuing any and all purging, deleting, erasing, overwriting or destroying of electronic documents in your possession irrespective of your normal business practice.

23.    If any information requested herein is withheld under claim of privilege, or is not provided for whatever reason, you are requested at the time of responding to these Requests to (a) describe in detail the claim of privilege or other reason used to withhold the information and (b) identify all information by date and subject matter as required by applicable law.

24.    The relevant time period, unless otherwise indicated, shall be from January 1, 1995 to

the date of the response, and shall include all documents and information which relate in whole or in part to such period, or to events or circumstances during such period, even though dated, prepared, generated or received prior or subsequent to that period.

25.  This subpoena is being served to ensure observance of the recipient's legal duty to preserve all documents which are within the scope of discovery in this action.  The requested categories specified in the subpoena merely reflect the parties' best efforts to identify documents within that scope based on their knowledge of the underlying facts of the case at this time. Regardless of the scope of this subpoena, the IT Group Litigation Trust Trustee is required to preserve all such documents which are within the scope of discovery in this case as delineated by the allegations in the Second Amended Complaint, other filings or developments in this case or filings, discovery of additional facts or other developments in any related actions, or facts known to the IT Group Litigation Trust Trustee (including all employees or other agents thereof).  Gaps or omissions in the subpoena shall not be taken as a basis, justification, license or excuse to destroy or fail to preserve any such documents.

## DOCUMENTS TO BE PRODUCED

1.     All files or documents, including memoranda and correspondence, of Anthony DeLuca, Harry Soose, James Pierson, Richard Conte, Francis Harvey or Karl Schwartz.

2.     All files or documents, including memoranda and correspondence, of IT Group heads or their immediate subordinates (e.g. vice-presidents) of business lines or subsidiaries, or controllers of such business lines or subsidiaries who held such position at any time during the period 1996 to 2002, including but not limited to Enzo Zoratto, Dennis Galligan, David Derry, Gary Gardner, Tom Marti, and Mary Geiger.

3.     All files or documents, including memoranda and correspondence, of David Igata, Joseph Iovino, James Kirk, Tom Marti, Drew Park, Kirk Saunders, Kevin Smith, and Paul Smith.

4.     All documents consisting of, referring to, relating to or reflecting contacts communications and correspondence between Pittsburgh headquarters offices (including Anthony DeLuca, Harry Soose, James Pierson or Richard Conte) and any of the business lines or subsidiaries concerning financial results, accounting methods or issues, cash handling or availability, payment of vendors, or other accounting, financial or liquidity issues.

5.     All documents relating to, referring to or reflecting the resignation, dismissal or termination of Anthony DeLuca from his position as CEO of IT Group.

6.     All documents relating to, referring to or reflecting the resignation, dismissal or termination of David Hill from his position at IT Group.

7.     All documents relating to, referring to or reflecting the resignation, dismissal or termination of Ray Pompe from his position at IT Group.

8.     All files or documents, including memoranda and correspondence, of IT Group's in-house counsel.

9.     All documents, including memoranda and correspondence, related to, referring to or reflecting any activity of or communication with any or all of IT Group's directors, including the entire board of directors, the directors individually, the audit committee, executive committee, or any other committee thereof. Such documents would include, but not be limited to, documents or other information provided to any board member or distributed at any meeting of the board or any committee or subcommittee thereof.

10.     All documents, including memoranda and correspondence, related to, referring to or reflecting any activity of or communication with the Carlyle Group or any of its representatives or agents, including but not limited to Philip Dolan or Daniel D'Aniello.

11.     All documents referring to, relating to or reflecting IT Group's relationship with the Carlyle Group, including but not limited to documents relating to issuance of dividends.

12.     All documents referring to, relating to or reflecting the Carlyle Group's purchase of preferred stock in IT Group in 1996, including but not limited to documents reflecting plans for IT Group or valuations of IT Group or any analysis of IT Group's then-current or future business prospects.

13.     All documents consisting of, related to, referring to or reflecting any annual report, SEC-related document or draft thereof, any filing with the SEC or draft thereof, whether or not such document was ever finalized, filed or transmitted.

14.     All documents consisting of, relating to, referring to or reflecting any contacts, communications or correspondence with the SEC.

15.     All documents consisting of, relating to, referring to or reflecting any contact, communication or correspondence with one or more shareholders or analysts, or any press release or draft thereof, whether or not the press release was ever finalized or issued.

16.    All documents consisting of, relating to, referring to or reflecting projections, pro formas, or estimations of IT Group's revenue, expenses, cash usage or other financial or operating results.

17.    All accounting documents of the IT Group or any of its business lines or subsidiaries or of any of the companies or entities acquired by IT Group.

18.    All documents or files of the accounting department of IT Group, including but not limited to memoranda, files, ledgers, or aging or other accounting reports.

19.    All documents reflecting the accounting system, accounting methods or internal accounting controls of IT Group or any of its business lines or subsidiaries.

20.    All documents relating to, referring to or reflecting the financial or operational results of any of IT Group's business lines or subsidiaries, including but not limited to the reporting thereof to Pittsburgh headquarters and/or any review or revision or critique of such reported results by anyone at Pittsburgh headquarters.

21.    All documents related to or reflecting any audit or internal audit of IT Group or any of its business lines or subsidiaries, including but not limited to any audit by Ernst & Young or any internal audit by Arthur Anderson or IT Group's internal audit department.

22.    All documents relating to, referring to or reflecting any services performed by Ernst & Young for IT Group (including any subsidiaries or business lines).

23.    All documents relating to, referring to or reflecting any services performed by Arthur Anderson for IT Group (including any subsidiaries or business lines).

24.    All documents consisting of, relating to, referring to, or reflecting contacts, communications and correspondence with Ernst & Young.

25.    All documents consisting of, relating to, referring to or reflecting contacts,

communications and correspondence with Arthur Andersen.

26. All documents related to cash handling or cash handling practices or cash management or cash management practices by IT Group, including but not limited to cash transfers between or among bank accounts, subsidiaries, the main Pittsburgh office, or other internal transfers.

27. All documents, consisting of, relating to, referring to or reflecting internal memoranda or other communications concerning cash handling or cash management including but not limited to cash transfers between or among bank accounts, subsidiaries, the main Pittsburgh office, or other internal transfers.

28. All documents consisting of, referring to, relating to or reflecting contacts, communications or correspondence with any of IT Group's lenders, lending banks, or suppliers of credit in connection with IT Group's credit line or term loans, including but not limited to Citibank or Fleet Bank.

29. All documents referring to related to or reflecting IT Group's liquidity or cash needs or usage, or credit line availability or usage, including not not limited to any subsidiaries, business lines or projects. Such documents would include but not be limited to projections of cash flow or cash usage.

30. All documents related to, referring to or reflecting IT Group's revolving credit line, including but not limited to the usage of that credit line.

31. All documents referring, relating to or reflecting to loans, borrowing, funding, underwriting or offering or sale of securities or notes by IT Group , whether existing or possible or prospective, public or private.

32. All documents related to, referring to or reflecting IT Group obtaining the $100 million Term C loan in early 2000, including but not limited to documents reflecting the need for or

reasons for obtaining that loan, plans for using the funds, and actual usage of the funds.

33.    All documents related to, referring to or reflecting IT Group's bank or lending agreements or loan covenants, including but not limited to proposed or actual amendment thereof, or projected, past, current or future compliance or non-compliance therewith, or any potential or actual default or violation of any loan terms or covenants.

34.    All documents relating to, referring to or reflecting any discussion of, study of, or actual sale of operating or real estate assets including but not limited to sale of any subsidiaries or business lines, including but not limited to any such documents relating to any effort to meet IT Group's liquidity needs.

35.    All documents relating to, referring to or reflecting payment to vendors, including but not limited to late payment, withholding of payments, or consequences of the foregoing, and including but not limited to documents reflecting contacts, communications or correspondence with vendors or customers (including the U.S. government) regarding the foregoing.

36.    All documents consisting of, referring to, relating to or reflecting internal memoranda or other communications concerning payment to vendors, including late payment, withholding of payments, or consequences of the foregoing.

37.    All documents referring to, related to or reflecting accounts payable, handing of payables, aging of payables or issuing vouchers or vouchering of payables.

38.    All documents referring to, related to or reflecting delinquent, past due, untimely, or disputed payments to contractors or subcontractors.

39.    All documents referring to, related to or reflecting any problems with contractors or subcontractors or equipment used or to be used for projects, including but not limited to hiring contractors or subcontractors, any instance of their walking off jobs for non-payment, inability to

purchase or rent equipment and use or non-use of equipment due to payment or subcontractor problems.

40.     All documents referring to, relating to or reflecting any acquisitions by IT Group, whether or not ultimately finalized, including but not limited to the acquisition of OHM, Emcon, Beneco, Fluor Daniel GTI, Roche Limited Consulting Services, or EFM Group, including but not limited to any investigation or due diligence conducted by IT Group and/or the Carlyle Group in connection with any acquisition transaction.

41.     All documents referring to, relating to or reflecting any accounting or financial records related to any acquisition by IT Group, including but not limited to documents reflecting valuation of acquired assets, any goodwill account, or any write-downs or write-offs of acquired assets.

42.     All documents referring to, relating to or reflecting acquisition purchase price adjustments involving accounts receivable, including but not limited to any such purchase price adjustments which related to any write down of receivables in 2001.

43.     All documents supporting, referring or relating to the amounts booked as goodwill in connection with companies acquired by IT Group between 1996 and 2002.

44.     All documents referring to, relating to or reflecting any projections or assessment of performance or future performance related to any acquisition(s) by IT Group, including but not limited to any statement of goals or the extent to which such goals were or were not met or achieved.

45.     All documents referring to, relating to or reflecting the financing of acquisitions by IT Group, including but not limited to any financing plans (whether or not accepted), or contacts with banks other lenders or underwriters.

46.     All documents referring to, relating to or reflecting the existence, validity or

collectability of IT Group's accounts receivable.

47.    All documents referring to, relating to or reflecting accounts receivable aging reports.

48.    All documents referring to, relating to or reflecting any reserve taken for accounts receivable, such as any reserve for uncollectable receivables, including but not limited to documents related to the calculation or method used for the calculation of the amount of such reserves.

49.    All documents referring to, relating to or reflecting any possible or actual write-offs or write-downs of accounts receivable, whether or not such write-offs or write-downs were ultimately taken, including but not limited to documents reflecting which accounts, receivables, projects or other items were to be subject to the write-off or write-down, and documents reflecting any analysis of such accounts or other basis for taking the write-off or write-down. Such documents include, but are not limited to, the write-offs reflecting in a December 2001 presentation to IT Group's banks, and write-offs reflected in IT Group's audited 2001 financial statements as included in a Form 8-K filed with the SEC by the Shaw Group in 2002.

50.    All documents referring to, relating to or reflecting the "special charge" taken by IT Group in the fourth quarter of 2000, including but not limited to documents reflecting calculation or determination of the special charge, which accounts, receivables, projects or other items were subject to the charge, and documents reflecting any analysis of such accounts or other basis for taking the charge.

51.    All documents referring to, relating to or reflecting any review of accounts receivable, including any review undertaken in connection with the "special charge" for the fourth quarter of 2000 or in connection with the write-offs reflected in a December 2001 presentation to IT Group's banks or the write-offs taken in IT Group's audited 2001 financial statements as included in a Form 8-K filed with the SEC by the Shaw Group in 2002.

52.    All documents referring to, relating to or reflecting what is referred to in the September 20, 2000 IT Group audit committee meeting minutes as follows: "An acquisition evaluation review, as well as the on-going accounts receivable review, including a detailed by-project review of unbilled accounts receivable contained in acquired computer systems, including the Oracle system were discussed. In this regard, approximately (200) two hundred projects are being reviewed which represent over 70% of the universe. Discussion with the project managers, project administrators, and business line presidents has commenced and is expected to be a lengthy process which will include interface with clients to determine realization estimates. As earlier anticipated, the review process is scheduled to be completed during the later part of the fourth quarter."

53.    All documents referring to, relating to or reflecting the existence, validity and collectability of accounts receivable for particular projects for which write-offs or write-downs were contemplated or taken, including but not limited to the projects listed on Exhibit "A" hereto, which includes a project claims and a/r analysis as of December 1, 2000 and the attached issues list FYE December 28, 2001.

54.    All documents referring to, relating to or reflecting the existence, validity and collectability of accounts receivable generated by OHM, including but not limited to the OHM projects listed on Exhibit "B."

55.    All documents referring to, relating to or reflecting any claims or change orders included in IT Group's accounts receivables, including but not limited to documents reflecting their existence, validity and collectability.

56.    All documents consisting of, referring to, relating to or reflecting contacts, communications or correspondence with IT Group's attorneys or in-house counsel concerning the validity, existence or collectability of accounts receivable, including but not limited to the validity,

existence or collectability of change orders or claims included in receivables.

57.    All documents referring to, relating to or reflecting the billed and unbilled receivables within the accounts receivable of IT Group, including but not limited to any calculation of billed and unbilled receivables, any back-up or documentation which would substantiate or evidence the accuracy of any disclosures concerning billed or unbilled receivables, any statement of the amount of billed and unbilled receivables, any reports of billed and unbilled receivables to IT Group's lending banks, and any adjustment which may have been made to billed and unbilled receivables for purposes of reporting such amounts to the public in SEC filings, press releases or other public statements.

58.    All documents referring to, relating to or reflecting the IT Group's backlog, including but not limited to the amount of backlog, the calculation of backlog, allocation of backlog amount IDO, fixed price, cost-plus or other types of government contracts, the basis for claiming backlog amounts on specific projects (such as project contracts), the basis for projecting revenues on the projects which were claimed as part of the backlog, and any allocation of projected project revenues among IT Group and other companies which were participants in such projects.

59.    All documents referring to, relating to or reflecting the government contractors other than IT Group which were participants in contracts or projects for which revenues were included in IT Group's claimed backlog.

60.    All documents referring to, relating to or reflecting the actual calculation or method used by IT Group to calculate its claimed backlog for IDO (indefinite order) contracts with the Government.

61.    All documents referring to, relating to or reflecting the calculation of, or basis for claimed backlog on projects comprising 5% or more of the backlog claimed by IT Group. (This

request includes, but is not limited to the backlog-related items specified in prior requests, such as basis for projected revenue, contracts, existence of other contractors on the projects).

62.    All documents referring to, relating to or reflecting the calculation of, or basis for claimed backlog derived from each of the projects listed as "largest contracts by business line as of September 28, 2001" on the attached Exhibit "C." (This request includes, but is not limited to the backlog-related items specified in prior requests, such as basis for projected revenue, contracts, existence of other contractors on the projects).

63.    All documents referring to, relating to or reflecting the Government "pay when paid" (also possibly referred to as "bill when paid") regulations, any requirements for billing or payment contained in the Federal Acquisition Regulations, any requirements for billing or payment in any state or local government regulations, or any law, rule or regulation applicable to government contractors which impacts on whether any receivable can be billed to or collected from the government (federal, state, or local).

64.    All documents referring to, relating to or reflecting any discussion or calculation of amounts which had to be paid to contractors or others before IT Group could, would, or was in whole or in part entitled to bill and/or collect receivables from any government or private client or customer.

65.    All documents referring to, relating to or reflecting Kroll Zolfo Cooper's liquidation analyses of IT Group performed in or around the third or fourth quarter of fiscal 2001, including but not limited to all documents provided to Kroll Zolfo Cooper in connection with its analysis.

66.    All documents referring to, relating to or reflecting PWC's liquidation analyses of IT Group performed in or around fiscal 2001 or early 2002, including but not limited to all documents provided to PWC in connection with its analysis.

67.    All documents referring to, relating to or reflecting, used or provided in connection with, or forming the basis for, any report by the bankruptcy court-appointed examiner R. Todd Neilson (including but not limited to the examiner's First Report dated march 11, 2002), and/or any report of Chanin Capital Partners, including but not limited to the Restructuring Plan for IT Group dated April 11, 2002.

68.    All documents referring to, relating to or reflecting, used or provided in connection with, or forming the basis for, any valuation or assessment of IT Group assets, liabilities, or operations during 1996 to the present.

69.    All documents referring to, relating to or reflecting, used or provided in connection with, or forming the basis for, any valuation or assessment of IT Group assets, liabilities or operations related to the sale or disposal of all or part of IT Group as part of the bankruptcy process, including but not limited to the sale of assets to the Shaw Group.

70.    All documents referring to, relating to or reflecting the sale of IT Group assets to the Shaw Group.

71.    All documents referring to, relating to or reflecting any due diligence or investigation of IT Group by the Shaw Group, including but not limited to documents provided or shown or offered to the Shaw Group or utilized or relied upon by the Shaw Group in connection with such due diligence or investigation.

72.    All documents requested (of the IT Group Litigation Trust Trustee, Ernst & Young or any other party) or produced (by the IT Group Litigation Trust Trustee, Ernst & Young or any other party), whether informally or pursuant to a discovery request, in any related litigation, including but not limited to the following cases:  Staro Asset Management LLC v. DeLuca et al., U.S. District Court, W.D.Pa. Case No. 02-0886, (2) the Trustee's action, IT Litigation Trust v. D'Aniello et al.,

U.S. District Court for the District of Delaware Case No. 04-CV-1268KAJ, as well as a case filed by

the Trustee in August, 2005 against IT Group auditor Ernst & Young in Delaware State court for

New Castle County, and (3) two related cases brought by one of the lenders in the Citibank

consortium: Highland Capital Management et al. v. Ernst & Young, LLP and The Carlyle Group,

Case No. 03-04530, in the District Court of Dallas County, Texas, 192nd Judicial District, and

Highland Capital Management v. TC Group, et al, Case No. 04C-06-068 RRC, in the Superior Court

of the State of Delaware in New Castle County.

73.    All documents, including drafts, constituting, referring or relating to any public filing

by the IT Group, including but not limited to, proxy solicitations, annual reports, quarterly reports or

press releases.

74.    All documents relating to any communication between the IT Group and Thomas

Payne, Sid Archinal, Gary Karesh, Jo Ann Karesh, Belca Swanson or Merle Swanson or any agent or

representative thereof.

75.    All files or documents, including memoranda and correspondence, of Frank Rice.

76.    All documents relating to, referring to or reflecting on their face any payment or

prepayment or negotiations or terms of any proposed deal for such payment or prepayment on the

project for the Iron Mountain Mines Superfund Site, including but not limited to document reflecting

contacts, communications or correspondence with the U.S. Government or any insurance carrier or

any source of funds for such prepayment. Such documents would include, but not be limited to

documents relating to the $33 million advance payment received in December 2000 as reported in IT

Group's 2000 Form 10-K.

77.    All documents referring to, relating to or reflecting any of the projects specifically

referred to in the Second Amended Complaint ("SAC"), including but not limited to projects cited as

subject to improper accounting (see, e.g. SAC ¶ 243—Erie PA power project), SAC ¶ 257 (PSE&G project),  SAC ¶ 281 (Norfolk Air Naval Station project) and/or projects shown to Fran Harvey. (See, e.g. SAC ¶ 267 (Fresno, CA project), SAC ¶ 268 (Florida Everglades project).

78.   All documents which identify the internal project numbers assigned by IT Group to its own projects.

# EXHIBIT A TO SUBPOENA

The IT Group
Project Claims & A/R Analysis
(In millions)

| | Claim Submittal & Collect. A/R | Anticipated Settlement | Book Position net of purch accl reserve | Potential Benefit (Loss) | Cash Proceeds before 6/30/01 | Cash Proceeds between 7/01-12/01 | Total Anticipated Settlement |
|---|---|---|---|---|---|---|---|
| **Legacy Claims** | | | | | | | - |
| Fons/Willow Run | $ | | $ 3.6 | | | | - |
| Occidental-IT Only | | | 0.9 | | | | - |
| Coakley | | | 6.6 | | | | - |
| American Creosote/Cape Fear | | | 3.8 | | | | - |
| Wellsville | | | 2.4 | | | | - |
| Weyerhauser | | | 1.1 | | | | - |
| Cacos | | | 1.4 | | | | - |
| Sikes | | | 1.5 | | | | - |
| Total | 28.3 | 11.5 | 21.5 | (10.0) | 5.5 | 6.0 | 11.5 |
| | | | | | | | |
| **Acquired Claims** | | | | | | | - |
| Occidental-OHM Only | | | 3.1 | | | | - |
| Penn Mines | | | 3.9 | | | | - |
| Lake Apopka | | | 0.9 | | | | - |
| Sevanson | | | 1.9 | | | | - |
| Monticello | | | 10.3 | | | | - |
| Earth Tech | | | 5.5 | | | | - |
| D Eagle | | | 0.8 | | | | - |
| Norfolk | | | 3.6 | | | | - |
| Total | 48.2 | 20.0 | 30.0 | (10.0) | 10.0 | 10.0 | 20.0 |
| | | | | | | | |
| **Acquired A/R Issues** | | | | | | | - |
| LandDiv | | | - | | - | - | - |
| Emcon Ind. Svcs | | | - | | - | - | - |
| Wilco Trainer | | | - | | - | - | - |
| Chemical Sales | | | - | | - | - | - |
| SFWMD S5A | | | - | | - | - | - |
| Hercules Parlin Landfill | | | - | | - | - | - |
| Button Gwinett Landfill | | | - | | - | - | - |
| Weslem Processing | | | - | | - | - | - |
| Pfister Wastewater Lagoon | | | - | | - | - | - |
| Georgia Pacific-Rem | | | - | | - | - | - |
| Parsons Landfill | | | - | | - | - | - |
| SMC/WWTP | | | - | | - | - | - |
| CK-Wilco | | | - | | - | - | - |
| B.J. Landfill | | | - | | - | - | - |
| Zeneca AG-Rem Svc Op. #2 | | | - | | - | - | - |
| Dupont | | | - | | - | - | - |
| Sanders (Beneco) | | | - | | - | - | - |
| Total | 7.5 | - | 7.5 | (7.5) | - | - | - |
| | | | | | | | |
| **Oracle Unbilled & Cost Reim.** | | | | | | | - |
| Howard | | | - | | - | | - |
| Phelps | | | - | | | | - |
| Razor | | | - | | | | - |
| Kinney | | | - | | | | - |
| CIP | | | - | | | | - |
| PEG | | | - | | | | - |
| Other | | | - | | | | - |
| Add'l Reserve | | | | | | | - |
| Total | 7.6 | 2.6 | 7.6 | (5.0) | 0.9 | 1.7 | 2.6 |
| | | | | | | | |
| Chi Mei | 1.7 | 1.7 | 4.2 | (2.5) | 1.7 | | 1.7 |
| | | | | | | | |
| Cumulative Total | $ 93.3 | $ 35.8 | $ 70.8 | $ (35.0) | $ 18.1 | $ 17.7 | $ 35.8 |

XYZ 0000898

The IT Group
Project Claims & A/R Analysis
As of December 1, 2000
$(000's)

| | | | Amounts before write offs | | | | | | | Amounts adjusted for write offs | | | | | |
| | | | Year to Date | | | Project to Date | | | Write | Year to Date | | | Project to Date | | |
| Project Name | Project N | Bus_Line | Revenue | Margin | Margin % | Revenue | Margin | Margin % | Offs | Revenue | Margin | Margin % | Revenue | Margin | Margin % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Legacy Claims** | | | | | | | | | | | | | | | |
| Fons/Willow Run | 45177 | CEC | 646 | (5) | -0.7% | 54,403 | (364) | -0.5% | (1,000) | (354) | (1,005) | 283.8% | 53,403 | (1,364) | -2.4% |
| Occidental - IT On | 515569 | CEC | 4 | (0) | -6.6% | 2,334 | (220) | -0.8% | (600) | (596) | (600) | 100.6% | 1,734 | (820) | -47.0% |
| Coakley | 768303 | CEC | 249 | 250 | 100.2% | 7,717 | 247 | 3.2% | (3,500) | (3,251) | (3,250) | 100.0% | 4,217 | (3,253) | -77.1% |
| American Creosol | 305975 | CEC | - | - | 0.0% | 21,055 | 2,002 | 0.5% | (2,500) | (2,500) | (2,500) | 100.0% | 18,555 | (498) | -2.7% |
| Wellsville | 765316 | CEC | 10 | - | 0.0% | 7,359 | 246 | 3.3% | (1,900) | (1,890) | (1,900) | 100.5% | 5,459 | (1,654) | -30.3% |
| Weyerhauser | 766646 | CEC | - | - | 0.0% | 4,449 | (423) | -9.5% | (1,000) | (1,000) | (1,000) | 100.0% | 3,449 | (1,423) | -41.3% |
| Lake Apopka | 773913 | CEC | 31 | (0) | -0.3% | 4,791 | (0) | 0.0% | - | 31 | (0) | -0.3% | 4,791 | (0) | 0.0% |
| Cecos | 770661 | CEC | - | - | 0.0% | 3,004 | 163 | 4.2% | (900) | (900) | (900) | 100.0% | 3,004 | (737) | -24.5% |
| Sikes | 760697 | CEC | 44 | - | 0.0% | 118,111 | 26,241 | 22.2% | - | 44 | - | 0.0% | 118,111 | 26,241 | 22.2% |
| **Total** | | | 985 | 245 | 24.9% | 224,182 | 27,983 | 12.5% | (11,400) | (10,415) | (11,155) | 107.1% | 212,782 | 16,583 | 7.8% |
| | | | | | | | | | | | | | | | |
| **Acquired Claims** | | | | | | | | | | | | | | | |
| Occidental - OHM | 915275 | CEC | - | - | 0.0% | 13,731 | 823 | 6.0% | (1,400) | (1,400) | (1,400) | 100.0% | 12,331 | (577) | -4.7% |
| Penn Mims | 920386 | CEC | 501 | (0) | 0.0% | 9,776 | 200 | 2.0% | (2,400) | (1,900) | (2,400) | 126.4% | 7,376 | (2,200) | -29.8% |
| Sevenson | 9E+07 | DOD | 276 | 30 | 10.7% | 11,699 | 167 | 1.4% | 1,100 | 1,376 | 1,130 | 82.1% | 12,798 | 1,267 | 9.9% |
| Monticello | 918090 | ENO | 3,142 | (9) | -0.3% | 57,992 | (1,438) | -2.5% | (6,300) | (3,158) | (6,309) | 199.8% | 51,692 | (7,738) | -15.0% |
| Earth Tech | 45/99 | DOD | 7,361 | 4,299 | 58.4% | 58,044 | 15,908 | 26.9% | (1,500) | 5,861 | 2,799 | 47.8% | 56,544 | 14,108 | 25.0% |
| Double Eagle | 920593 | CEC | 1 | - | 0.0% | 5,641 | 373 | 6.6% | (300) | (299) | (300) | 100.4% | 5,341 | 73 | 1.4% |
| Nortok | Beneco | OUT | - | - | #DIV/0! | 15,531 | (1,000) | -6.4% | (1,500) | (1,500) | (1,500) | 100.0% | 14,031 | (2,509) | -17.9% |
| **Total** | | | 11,281 | 4,320 | 38.3% | 172,413 | 14,734 | 8.5% | (12,300) | (1,019) | (7,980) | 782.9% | 160,113 | 2,434 | 1.5% |

XYZA 002800899

The IT Group
Project Claims & A/R Analysis
As of December 1, 2000
$(000's)

| Project Name | Project N | Bus Unit | Before write offs — Year to Date Revenue | Margin | Margin % | Before — Project to Date Revenue | Margin | Margin % | Write Offs | Adjusted — Year to Date Revenue | Margin | Margin % | Adjusted — Project to Date Revenue | Margin | Margin % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Acquired A/R Issues** | | | | | | | | | | | | | | | |
| LandDiv | 990029 | DOD | (250) | (250) | 100.0% | 1,750 | 1,750 | 100.0% | (1,800) | (2,050) | (2,050) | 100.0% | (50) | (50) | 100.0% |
| Emcon Ind. Svcs | 808304 | CEC | 735 | (200) | -27.2% | 735 | (200) | -27.2% | (500) | 235 | (700) | -298.3% | 235 | (700) | -298.3% |
| Wilcox Trainer | 777950 | CEC | (47) | (48) | 102.2% | 1,216 | 379 | 31.1% | (300) | (347) | (348) | 100.3% | 916 | 79 | 8.6% |
| Chemical Sales | 767646 | CEC | 465 | (228) | -55.7% | 4,735 | (200) | -4.2% | (1,200) | (795) | (1,428) | 179.3% | 3,535 | (1,400) | -39.6% |
| SFWAID SSA | 777683 | CEC | 1,032 | (567) | -55.0% | 10,005 | 1,860 | 18.6% | (1,000) | 32 | (1,567) | -874.3% | 9,005 | 860 | 9.6% |
| Hercules packv Lu | 777975 | CEC | 408 | (268) | -53.9% | 2,685 | (169) | -6.3% | (400) | 08 | (668) | -865.2% | 2,285 | (568) | -24.9% |
| Button Gwinell La | 783109 | CEC | 38 | (2) | -5.2% | 413 | 71 | 17.1% | (300) | (262) | (302) | 115.4% | 113 | (229) | -202.3% |
| Western Processj | 918368 | CEC | (9) | (1) | 5.3% | 11,007 | 3,311 | 30.1% | (200) | (209) | (201) | 95.7% | 10,807 | 3,111 | 28.8% |
| Fister Wastewate | 771714 | CEC | 6 | 0 | 0.0% | 1,263 | 162 | 12.9% | (200) | (194) | (200) | 102.9% | 1,063 | (38) | -3.5% |
| Georgia Pacific-R | 782160 | CEC | (6) | (1) | 23.0% | 244 | 48 | 19.5% | (100) | (106) | (101) | 95.6% | 144 | (52) | -36.2% |
| Parsons Landfill | 767661 | CEC | - | - | 0.0% | 1,338 | (814) | -60.8% | (200) | (100) | (100) | 100.0% | 1,238 | (914) | -73.8% |
| SMCWWTP | 108159 | CEC | (293) | (166) | 63.6% | 3,599 | 375 | 10.4% | (200) | (493) | (386) | 70.4% | 3,399 | 175 | 5.1% |
| CKAVRico | 803040 | CEC | 2 | 1 | 43.0% | 2 | 2 | 43.0% | (100) | (98) | (99) | 101.4% | (98) | (99) | 101.4% |
| B.J. Landfill | 782603 | CEC | 13 | (0) | -2.3% | 388 | 39 | 10.0% | (100) | (87) | (108) | 115.0% | 288 | (61) | -21.2% |
| Zeneca AG-Hem | 797307 | CEC | 39 | (0) | -21.1% | 817 | 143 | 17.5% | (100) | (81) | (108) | 178.7% | 717 | 43 | 6.0% |
| Dupont | 776411 | CEC | (6) | (0) | 100.0% | 1,030 | 48 | 4.7% | (100) | (108) | (108) | 100.0% | 930 | (62) | -6.5% |
| Sanders (Benaco) | Benaco | OUT | | | #DIV/0! | 1,364 | 679 | 24.0% | (500) | (500) | (500) | 100.0% | 1,364 | 679 | 5.5% |
| **Total** | | | 2,154 | (1,764) | -81.9% | 41,230 | 6,603 | 16.5% | (7,300) | (4,546) | (8,464) | 100.2% | 34,530 | 19,120 | 0.3% |
| **Oracle Unbilled & Cost. Rdmn.** | | | | | | | | | | | | | | | |
| Howard | | DOD | | | | | | | 100 | | | | | | |
| Phelps | | DOD | | | | | | | (800) | | | | | | |
| Razor | | DOD | | | | | | | (300) | | | | | | |
| Kenney | | DOD | | | | | | | (2,000) | | | | | | |
| CIP | | CEC | | | | | | | (1,500) | | | | | | |
| PEG | | CEC | | | | | | | (1,000) | | | | | | |
| Other | | Other | | | | | | | 2,000 | | | | | | |
| Addl Reserve | | | | | | | | | (6,000) | | | | | | |
| **Total** | | | | | | | | | | | | | | | |
| Chl Mel | | INT | | | | | | | (2,000) | | | | | | |
| **Cumulative Total** | | | 14,420 | 2,801 | 19.4% | 437,825 | 49,520 | 11.3% | (38,000) | (15,950) | (27,599) | 172.7% | 407,425 | 19,120 | 4.7% |

XYA 0029900900

The IT Group
Project Claims & A/R Analysis
As of December 1, 2000
$(000's)

| | | | Amounts before write offs | | | | | | Wells Off | Amounts adjusted for write offs | | | | | |
| | | | Year to Date | | | Project to Date | | | | Year to Date | | | Project to Date | | |
| Project Name | Project No. | Bus Line | Revenue | Margin | Margin % | Revenue | Margin | Margin % | | Revenue | Margin | Margin % | Revenue | Margin | Margin % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Legacy Claims | | | | | | | | | | | | | | | |
| Fernald/Wilcox Run | 767445/772802 | CEC | 648 | (6) | -0.7% | 54,403 | (364) | -0.5% | (1,000) | (364) | (1,000) | 283.6% | 53,403 | (1,364) | -2.4% |
| Elsie Acid | 515550 | CEC | 4 | (0) | -6.8% | 2,334 | (228) | -9.8% | (600) | (98) | (600) | 100.6% | 1,734 | (828) | -47.8% |
| Occidental - IT Only | 783303 | CEC | 249 | 250 | 100.2% | 7,717 | 247 | 3.2% | (3,500) | (346) | (3,250) | 100.0% | 4,217 | (3,253) | -77.1% |
| Coakley | 305976 | CEC | | | | 21,055 | 1,002 | 8.5% | (2,500) | (3,261) | (2,500) | 100.0% | 18,555 | (499) | -2.7% |
| American Creosote/Cape Fear | 783318 | CEC | 10 | | 0.0% | 7,359 | 248 | 3.3% | (1,800) | (1,800) | (1,900) | 100.5% | 5,459 | (1,454) | -30.3% |
| Walkville | 789646 | CEC | | | 0.0% | 4,449 | (423) | -9.5% | (1,000) | (1,000) | (1,000) | 100.0% | 3,449 | (1,423) | -41.3% |
| Weyerhaeuser | 773913 | CEC | (0) | (0) | -0.3% | 4,701 | (0) | 0.0% | 31 | 0 | 0 | -0.3% | 4,701 | (0) | 0.0% |
| Lake Apopka | 788668 | CEC | | | 0.0% | 3,904 | 163 | 4.2% | (800) | (800) | (800) | 100.0% | 3,004 | (737) | -24.5% |
| Cecos | 770461 | CEC | 31 | | 0.0% | 118,171 | 26,241 | 22.2% | 44 | 31 | 44 | 100.0% | 118,171 | 26,241 | 22.2% |
| Sikes | 760097 | CEC | 44 | | 0.0% | 15,531 | 11,000 | | | | | | 14,031 | 7,550 | -17.3% |
| **Total** | | | 985 | 245 | 24.9% | 224,182 | 27,983 | 12.5% | (11,405) | (10,415) | (11,155) | 107.1% | 212,782 | 18,583 | 7.8% |

| Acquired Claims | | | | | | | | | | | | | | | |
| Occidental - OHM Only | 915275 | CEC | | | 0.0% | 13,771 | 823 | 6.0% | (1,400) | (1,400) | (1,400) | 100.0% | 12,331 | (577) | -4.7% |
| Penn Mines | 920384 | CEC | 501 | (0) | 0.0% | 3,778 | 200 | 2.0% | (2,400) | (1,907) | (2,400) | 126.4% | 7,376 | (2,200) | -28.8% |
| Stevenson | 8715520 | CEC | 278 | 30 | 10.7% | 11,894 | 167 | 1.4% | (1,100) | 1,278 | 1,130 | 82.1% | 12,798 | 1,287 | 9.9% |
| Montkello | 816500 | ENO | 3,142 | | -0.3% | 57,992 | (1,438) | -2.5% | (6,200) | (3,158) | (6,200) | 199.6% | 51,592 | (7,738) | -15.0% |
| Earth Tech | 990045/990046 | DOO | 7,361 | 4,269 | 58.4% | 55,044 | 15,608 | 28.5% | (1,500) | 5,861 | 2,769 | 47.3% | 55,544 | 14,108 | 25.0% |
| Double Eagle | 920503 | CEC | 1 | | 0.0% | 5,641 | 375 | 6.6% | (300) | (299) | (300) | 100.4% | 5,341 | 73 | 1.4% |
| Norfolk | Benco | OUT | | | #DIV/0! | 15,531 | 11,000 | -6.4% | (1,500) | (1,500) | (1,500) | 100.0% | 14,031 | 7,550 | -17.3% |
| **Total** | | | 11,281 | 4,320 | 38.3% | 172,413 | 14,734 | 8.5% | (12,300) | (1,010) | (7,940) | 783.8% | 160,113 | 2,434 | 1.5% |

| Acquired A/R Issues | | | | | | | | | | | | | | | |
| Lantiville | 890026 | DOD | (250) | (250) | 100.0% | 1,750 | 1,750 | 100.0% | (1,400) | (2,050) | (2,050) | 100.0% | (50) | (50) | 100.0% |
| Emcon Ind. Svcs | 808301 | CEG | 735 | (200) | -27.2% | 735 | (200) | -27.2% | (500) | 235 | (700) | -298.3% | 235 | (700) | -298.3% |
| Wilcox Traileer | 777950 | CEG | (47) | (48) | 102.2% | 1,218 | 379 | 31.1% | (300) | (347) | (348) | 100.3% | 818 | 79 | 9.6% |
| Chemical Salee | 776746 | CEG | 405 | (226) | -55.7% | 4,735 | (200) | -4.2% | (1,100) | (695) | (1,428) | 179.2% | 3,635 | (1,400) | -39.6% |
| SFWMD SSA | 777683 | CEG | 1,032 | (567) | -55.0% | 10,005 | 1,840 | 18.4% | (1,000) | 32 | (1,597) | 4974.3% | 9,005 | 860 | 9.5% |
| Hercules Parlin Landfill | 777975 | CEG | 488 | (268) | -53.9% | 2,825 | (16) | -0.6% | (300) | 58 | (668) | -688.3% | 2,285 | (568) | -24.9% |
| Button Gwinnett Landfill | 783109 | CEG | 28 | (7) | -25.3% | 413 | 71 | 17.1% | (300) | (362) | (302) | 115.4% | 113 | (229) | -202.3% |
| Western Processing | 783268 | CEG | 6 | (1) | 5.3% | 11,907 | 3,311 | 26.1% | (800) | (194) | (201) | 95.7% | 10,807 | 3,111 | 28.8% |
| Pfister Waterway Lagoon | 787174 | CEG | (0) | | 0.0% | 1,263 | 162 | 12.3% | (100) | (108) | (101) | 102.5% | 1,063 | (38) | -3.5% |
| Georgia Pacific-Rem | 782100 | CEG | | (1) | 23.0% | 244 | 48 | 19.8% | (100) | (100) | (100) | 95.6% | 144 | (52) | -38.2% |
| Parsons Landfill | 787601 | CEG | (203) | | 63.6% | 1,338 | (614) | -52.9% | (100) | (100) | (101) | 100.0% | 1,238 | (914) | -73.6% |
| SAKGWWTP | 108158 | CEG | 2 | (188) | 63.6% | 3,599 | 375 | 10.4% | (433) | (433) | (348) | 72.4% | 3,399 | 117 | 5.1% |
| CK-Wilco | 803040 | CEG | 13 | 3 | -2.3% | 388 | 39 | 10.0% | (100) | (97) | (97) | 115.4% | 288 | (59) | -21.2% |
| B.J. Landfill | 782603 | CEG | 39 | (3) | -11.1% | 817 | 143 | 17.5% | (100) | (81) | (81) | 124.7% | 717 | 43 | 6.0% |
| Zeneca AG-Rem Svc Op #2 | 787207 | CEG | 1 | (8) | 100.0% | 1,030 | 48 | 4.7% | (100) | (108) | (108) | 128.7% | 930 | (52) | -5.5% |
| Dupont | 716411 | CEG | | (8) | 0.0% | 1,964 | 979 | 24.5% | (100) | (81) | (100) | 100.4% | 1,864 | 79 | 5.8% |
| Sandees (Benco) | Benco | OUT | | | #DIV/0! | | | | (800) | (600) | (600) | 166.2% | 14,031 | 103 | 0.3% |
| **Total** | | | 2,154 | (1,764) | -81.9% | 41,230 | 8,803 | | (7,300) | (4,549) | (8,444) | | 34,530 | 103 | |

| Oracle Unbilled & Cost. Retm. | | | | | | | | | (5,000) | | (5,000) | | | | |
| **Total** | | | | | | | | | (9,000) | | | | | | |

| Chil Mel | | INT | | | | | | | | | | | | | |

| **Cumulative Total** | | | 14,420 | 2,801 | 19.4% | 437,825 | 49,520 | 11.3% | (34,005) | (15,960) | (27,539) | 172.7% | 407,425 | 19,120 | 4.7% |

XYA 0800000901

The IT Group, Inc.
Issues List
FYE Dec 28, 2001

| | $ 000's | | | | Prop. W/Os | |
|---|---|---|---|---|---|---|
| | Yrs 98 & prior | 1999 | 2000 | 2001 Total | Prop. Total | |
| **Government Services:** | | | | | | |
| **HTRW:** | | | | | | |
| Coleman Evans | | | 650 | | 650 | Performance issues - cash acct. Strategy |
| EPA EHRS | 630 | | | | 630 | Client no bills - denied by client - Close out team |
| EPA ERRS | 1,550 | 250 | 70 | | 1,870 | Client no bills - denied by client - Close out team |
| Battelle | 300 | | | | 300 | Will be a charge to rate reserve or straight w/o |
| Rocky Mountain | | | 20 | | 20 | Settlement |
| Brookhaven | 23 | | | | 23 | All closed out |
| OHM | 12 | | | | 12 | Clean up |
| Monticello | 3,100 | | | | 3,100 | Cash acct. Strategy - hazards of litigation/ |
| Severson | 1,500 | | | | 1,500 | hazards of litigation/claim assessment change |
| Bunker Hill | | | 2,400 | | 2,400 | hazards of litigation/claim assessment change |
| Fernald | | | | 1,000 | 1,000 | Cash acceleration strategy/timing of revenue recognition |
| Tank 1A/Portsmouth Quadrant | | | | 725 | 725 | Performance issue |
| Billed A/R < 10K | 400 | | | | 400 | |
| Retainage | 50 | | | | 50 | |
| Unbilled A/R > 50K | 1,700 | | | | 1,700 | |
| Unbilled A/R < 50K | 300 | | | | 300 | |
| Georgia Tech | | | | 500 | 500 | Cash acceleration strategy |
| Hunter's Point | | | | 200 | 200 | This is a w/o of 50% of balance |
| Barter's Point | | | | 500 | 500 | To be reflected with Equip Div. (Cash Acct. 0 to 500K) |
| **Subtotal HTRW** | 9,565 | 250 | 3,140 | 2,925 | 15,880 | |
| | | | | | | |
| **Govt Rate Reserves:** | | | | | | |
| Change in est. on billings | | | 2,000 | | 2,000 | |
| AH. DCAA Audit adjust. | | | 1,000 | | 1,000 | |
| 2001 Fringe adjustments | | | | 2,000 | 2,000 | |
| **Total govt rate adjustments** | 0 | 0 | 3,000 | 2,000 | 5,000 | |
| | | | | | | |
| **Civil Works:** | | | | | | |
| Fort Sill | | | 2,100 | | 2,100 | |
| Pump Station 9A | | | | 1,400 | 1,400 | |
| **Subtotal Civil Works** | 0 | 0 | 2,100 | 1,400 | 3,500 | |
| | | | | | | |
| Benecci | | | 2,500 | | 2,500 | |
| Norfolk | | 550 | | | 550 | |
| Sanders | | | 400 | | 400 | |
| BEQ Brunswick | | | | 950 | 950 | |
| Mayport Exchange | | | | 300 | 300 | |
| FT Bliss | | | | | | |

IT-BOD-008650

BptlShtRev1.xls
J. Parsoni

1

12/2/01 8:23 PM

The IT Group, Inc.
Issue List
FYE Dec 28, 2001



|  | $ 000's |  |  | Prop. WIOs |  |
|---|---|---|---|---|---|
|  | Yrs 98 & prior | 1999 | 2000 | 2001 Total | Prop. Total |
| FT Drum 1-5 (DR) |  |  | 469 | 400 | 869 |
| FT Hood |  |  | 150 | 140 | 250 |
| Hill |  |  | 85 | 80 | 174 |
| Rutgers |  |  | 285 | 200 | 465 |
| Wright Pat |  |  | 80 | 68 | 108 |
| Chesapeake (Annapolis CH1200) |  |  | 229 | 200 | 429 |
| Chesapeake (Bethesda CH1800) |  |  | 106 | 100 | 206 |
| Chesapeake (Dahlgren CH1700) |  |  | 182 | 150 | 332 |
| Chesapeake (Indianhead CH1600) |  |  | 100 | 94 | 194 |
| Chesapeake (Navy Yard CH1300) |  |  | 100 | 71 | 171 |
| Chesapeake (Quantico CH1500) |  |  | 68 | 60 | 128 |
| FT Bragg |  |  | 280 | 250 | 530 |
| Subtotal Bsnrco | 0 | 550 | 5,014 | 3,092 | 8,656 |
|  |  |  |  |  |  |
| Facilities Management |  |  |  |  | 0 |
|  |  |  |  |  |  |
| HTRW Cost Accrual |  |  |  | 205 | 205 |
| Bsnrco Cost Accrual |  |  |  | 245 | 245 |
| Subtotal Cost Accrual |  |  |  | 450 | 450 |
|  |  |  |  |  |  |
| Total Government Services | 9,565 | 800 | 13,254 | 9,007 | 33,486 |
|  |  |  |  |  |  |
| CEC Business Line |  |  |  |  |  |
|  |  |  |  |  |  |
| CEC Engineering: |  |  |  |  |  |
|  |  |  |  |  |  |
| CEC Engineering South: |  |  |  |  |  |
| Chevron |  |  | 50 | 50 | 100 |
| Verizon |  |  | 100 |  | 100 |
| Bankruptcy |  |  | 13 |  | 13 |
| South Engineering > 300 |  | 200 | 125 |  | 325 |
| Billed < 10K |  |  | 200 | 50 | 250 |
| Subtotal billed | 0 | 200 | 488 | 100 | 788 |
|  |  |  |  |  |  |
| 2% Reserve on State Reimburs. |  |  |  |  |  |
| Category Four |  |  | 210 |  | 210 |
| City of Hammond |  |  |  | 50 | 50 |
| Carlton Fields |  |  |  | 35 | 35 |
| Landbank N/E Laundry |  |  |  | 25 | 25 |

2

IT-BOD-008651

DlalSMRev1.xls
J. Pierson

12/3/01 8:23 PM

A    32

The IT Group, Inc.
Issues List
FYE Dec 28, 2001

12/3/01 8:23 PM



|  | $ 000's | | | | Prop. W/Os |
| --- | --- | --- | --- | --- | --- |
|  | Yrs 98 & prior | 1999 | 2000 | 2001 Total | Total |
| Unbilled < 25K |  |  | 100 | 150 | 250 |
| Subtotal unbilled: | 0 | 0 | 310 | 295 | 605 |
| Total CEC Engineering South | 0 | 200 | 708 | 395 | 1,393 |
| **CEC Engineering West:** |  |  |  |  |  |
| University of CA |  |  | 60 |  | 60 |
| PAC Bell and Equiva Services |  |  | 10 | 10 | 20 |
| Eqqiva |  |  | 35 |  | 35 |
| L.A. Unified School District |  |  | 20 |  | 20 |
| Phillips |  |  | 30 |  | 30 |
| PG&E Bankruptcy |  |  | 15 |  | 15 |
| USGypsum |  |  | 20 |  | 20 |
| Unocal |  |  | 20 |  | 20 |
| Category 5 - Equiva |  |  | 100 |  | 100 |
| Magnolia |  | 25 |  |  | 25 |
| Chevron |  |  | 15 |  | 15 |
| Reichold |  | 35 |  |  | 35 |
| Subtotal billed | 0 | 60 | 325 | 10 | 395 |
| Category 1 |  | 170 | 300 |  | 470 |
| Reichhold/Lonestar |  |  | 55 |  | 55 |
| Martinez |  | 45 | 40 |  | 85 |
| Purity Oil |  |  |  | 225 | 225 |
| JWA |  |  | 60 |  | 60 |
| Goodwin |  |  |  | 20 | 20 |
| Equiva |  |  |  | 30 | 30 |
| Boeing |  |  |  | 40 | 40 |
| Purity Oil |  |  |  | 400 | 400 |
| Unbilled < 25K |  | 150 | 150 | 150 | 450 |
| Subtotal unbilled | 0 | 305 | 605 | 865 | 1,835 |
| Total CEC Engineering West | 0 | 425 | 930 | 675 | 2,230 |
| **CEC Engineering North** |  |  |  |  |  |
| Wilco | 55 |  | 1,000 | 1,000 | 1,000  ??? |
| Brookhill |  | 15 |  |  | 55 |
| Buckeye Asbestos | 33 |  |  |  | 15 |
| Glenn Springs | 33 |  |  |  | 33 |
| Clean Sales | 25 |  |  |  | 25 |

3

IT-BOD-008652

BdShtRev1.xls
J. Pierson

The IT Group, Inc.
Issues List
FYE Dec 28, 2001

| | $ 000's | | | | Prop. W/O's | |
|---|---|---|---|---|---|---|
| | Yrs 98 & prior | 1999 | 2000 | 2001 Total | 2001 Total | Prop. W/O's |
| Wheeling Pittsburgh | | | | 1,100 | 1,100 | 1,100 |
| Gypsum | | | | 10 | 10 | 10 |
| City of Rochester | | | | 20 | 20 | 20 |
| General Motors | | | | 20 | 20 | 20 |
| Shell | | | | 23 | 23 | 23 |
| Sachroff | | | 14 | | | 14 |
| Treescourt | | 26 | | | | 28 |
| Billed < 10K | | | | 150 | 150 | 159 |
| Subtotal billed | 113 | 41 | 1,014 | 1,323 | 1,323 | 2,491 |
| ANL Landfill | 240 | | | | | 240 |
| Bayer | | | 175 | | | 175 |
| SARSS | | | | 33 | 33 | 33 |
| Category 3 - other | | | | 93 | 93 | 93 |
| Category 3 - Dupont | | | | 26 | 26 | 26 |
| Occidental | 860 | | | | | 860 |
| TBS - 1E | 92 | | | | | 92 |
| PGS | | | | 45 | 45 | 45 |
| GM | | | | 34 | 34 | 34 |
| United Tech | | | | 20 | 20 | 20 |
| National Fuel | | | | 30 | 30 | 30 |
| Metropolitan | | | | 15 | 15 | 15 |
| United Tech | | | | 40 | 40 | 40 |
| Unbilled < 25K | | | | 200 | 200 | 360 |
| Recoverage | | | 160 | | | 0 |
| Subtotal unbilled | 1,102 | 0 | 335 | 536 | 536 | 2,003 |
| Total CEC Engineering North | 1,305 | 41 | 1,349 | 1,859 | 1,859 | 4,554 |
| Total CEC Engineering | 1,305 | 656 | 3,077 | 3,129 | 3,129 | 8,177 |
| CEC Construction: | | | | | | |
| Southeast (Gulf): | | | | | | 0 |
| Flamingo | | | 160 | 90 | 90 | 250 |
| Norfolk Southern | | 275 | | | | 275 |
| Phillips | | | | | | 0 |
| Phillips Petroleum Bus Line | 25 | | | | | 25 |
| South Florida WMD5A | | | | 1,025 | 1,025 | 1,025 |
| Blinking | | | | 45 | 45 | 45 |
| East Gator | | | | 50 | 50 | 50 |
| | | | | 4 | | |

BudShtRev1.xls
J. Pierson

IT-BOD-008653

12/3/01 8:23 PM

A    34

12/3/01 6:23 PM

**The IT Group, Inc.**
**Issues List**
**FYE Dec 28, 2001**



| | Yrs 98 & prior | 1998 | 2000 | 2001 Total | Prop. W/Os |
|---|---|---|---|---|---|
| | | $ 000's | | | |
| Hubbard Construction Perf. | | | | | 210 |
| South Florida WMDL10L12 | | 210 | | | 250 |
| Unbilled | | 250 | | | 0 |
| Lake Apopka | 650 | | | | 650 |
| Indian Trail | 265 | | | | 265 |
| Florida USSC | 100 | | | | 100 |
| Sun | | | 75 | 75 | 75 |
| FDOT | | | 275 | 30 | 350 |
| Osceola Farms | | 30 | | | 30 |
| USA Waste | | | | | 30 |
| Wingate | | | 80 | 1,200 | 1,200 |
| Rankin | | | | | 80 |
| Grove Gate | | | | 300 | 300 |
| American Equity | | | | 50 | 50 |
| ThermoReloc | | | | 500 | 500 |
| Polk County | | | | 600 | 600 |
| SFWMD 3/4 Supply | | | | 260 | 260 |
| SFWMD 3/4 Borrow | | | | 150 | 150 |
| Below 25K-Unbilled | | 100 | 100 | 100 | 300 |
| **Total South/East Const (Gulf)** | **1,040** | **885** | **650** | **4,475** | **7,070** |
| | | | | | |
| North Construction: | | | | | |
| ENCAP | | | 330 | | 330 |
| CBS | | | 50 | | 50 |
| Waste Mgmt | | 120 | 1,000 | | 120 |
| MillCreek | | | 100 | | 1,000 |
| Safety Light | | | | | 30 |
| Billed < 10K | | | | | 0 |
| Unbilled | | 160 | | | 160 |
| St Michael the Archangel | | | 40 | 30 | 140 |
| Roy Hart | | | 100 | 100 | 100 |
| PMS NYC | | | 90 | | 90 |
| NYC Transit | | | | 80 | 80 |
| NY Air Brakes | | | | 30 | 30 |
| Buffalo Airport | 35 | | | | 35 |
| OHM Beavers | | | | | 30 |
| PA DEP | | | | 30 | 30 |
| Palmetto Wood | | | | 30 | 30 |
| PSE & G | | 1,000 | 1,000 | 1,000 | 2,000 |
| Hercules | | | | | 2,000 |

5

IT-BOD-008654

A   35



The IT Group, Inc.
Issues List
FYE Dec 28, 2001

| | $ 000's | | | Prop. W/Os | Prop. W/Os |
| --- | --- | --- | --- | --- | --- |
| | Yrs 98 & prior | 1999 | 2000 | 2001 Total | Total |
| Exxon Bayway | | | 250 | | 250 |
| Chemtrol | | | | 13 | 13 |
| Port Auth./Echo/Stanford | | | 25 | | 25 |
| PPG Pulverizing | | 350 | 0 | | 350 |
| Wycoff Mills (LandBank) | | | 200 | | 200 |
| Unbilled < 25K | | | 75 | 75 | 150 |
| **Total North Construction** | 0 | 0 | 330 | 0 | 330 |
| | | | | | |
| South Construction: | | | | | |
| White | 76 | | | | 76 |
| OHM | 46 | | | | 46 |
| Elf Atochem | 28 | | | | 28 |
| Bush Valley Landfill | | | 1,000 | | 1,000 |
| AHP Impoundment | | | | 35 | 35 |
| Hoechst | | | 20 | | 20 |
| Willow Run | 750 | 100 | | | 750 |
| E-3 | | | | 25 | 100 |
| Kirby's Tire Fire | 2,000 | | | | 25 |
| Wellsville | 180 | 10 | | | 2,000 |
| Category 6 | 19 | | | | 190 |
| Ralph Gray Trucking | 25 | | 29 | | 19 |
| FDEP Orange | | | | | 29 |
| Kirby's Tire Fire | | | 32 | | 25 |
| Kopper's | 50 | | | | 32 |
| IT/JWEL | 800 | | | | 50 |
| Old Rust (verify) | 28 | | | | 800 |
| Clayton | 26 | | | | 28 |
| Pacific Env. Grp | 1,000 | | | | 26 |
| Sykas | 100 | | | | 1,000 |
| Weyerhauser | | | | | 100 |
| Unocal | | | | | 0 |
| **Total South Construction** | 5,163 | 1,740 | 5,671 | 1,448 | 14,022 |
| | | | | | |
| Major Programs/Midwest: | | | | | |
| Asarco | 35 | 150 | | | 150 |
| Schlumberger | 15 | | | | 35 |
| Alcoa | 300 | | | 250 | 15 |
| Old Inger | | | | | 550 |
| Nicor | | | 600 | 600 | 1,200 |
| IMC | | | 1,750 | 1,750 | 3,500 |

(6)

IT-BOD-008655

BalSntRev1.xls
J. Piexton

12/3/01 6:23 PM

The IT Group, Inc.
Issues List
FYE Dec. 28, 2001



| | $ 000's | | | | Prop. W/Os |
| --- | --- | --- | --- | --- | --- |
| | Yrs 98 & prior | 1998 | 2000 | 2001 Total | 2001 Total |
| Total Major Programs/Midwest | 350 | 150 | 2,350 | 2,600 | 5,450 |
| | | | | | |
| West | | | | 170 | 170 |
| Emcon Ind. Svcs | | | 170 | | 200 |
| Lockheed Martin | | 100 | 100 | | 270 |
| CR Briggs | | | | 2,000 | 2,000 |
| Fresno | | 70 | | | 70 |
| Intl Paper | | | | 325 | 325 |
| Parsons | | | 180 | | 180 |
| Chevron | | | 40 | | 40 |
| Tolache | | | | | 500 |
| Penn Mines | 500 | | | 1,000 | 1,000 |
| Cost Accrual | | | 450 | 450 | 900 |
| Eng MSA | | | | 35 | 35 |
| Aberdeen Proving Grounds | | | | | |
| Total West Construction | 500 | 170 | 950 | 4,080 | 5,700 |
| | | | | | |
| Total CEC Construction | 7,053 | 2,925 | 9,981 | 12,603 | 32,572 |
| | | | | | |
| Total CEC Eng & Const. Total | 8,358 | 3,591 | 13,088 | 15,732 | 40,749 |

Consulting & Technology:

| | | | | |
| --- | --- | --- | --- | --- |
| Unbilled A/R | 296 | 504 | 348 | 1,148 |
| Uncollectable A/R - System Issues | | 368 | | 368 |
| Disputes litigation | | 125 | 125 | 250 |
| Funding Issues | | | | 0 |
| Amounts under $20K | | | | |
| Subtotal unbilled | 296 | 995 | 473 | 1,764 |

| Billed A/R: | | |
| --- | --- | --- |
| Slow Payer identified uncollectable | 100 | 100 |
| Rate Adjustments | 50 | 50 |
| Client disputes | 339 | 339 |
| Bankruptcy | 140 | 140 |
| Claims | 100 | 100 |
| Uncollectable A/R - System Issues | 133 | 133 |
| Claims | 100 | 100 |

7

IT-BOD-008656

BalShtRev1.xls
J. Pierson

12/3/01 8:23 PM

The IT Group, Inc.
Issues List
FYE Dec 28, 2001

| | $ 000's | | | | Prop. W/Os |
| --- | --- | --- | --- | --- | --- |
| | Yrs 98 & prior | 1999 | 2000 | 2001 Total | |
| E-COM - litigation (claim) | | | 1,100 | | 1,100 |
| Amounts under $10K | | | | 962 | 0 |
| Subtotal billed | 0 | 0 | 1,100 | 962 | 2,062 |
| | | | | | |
| Writeoff earnest payment | | | 110 | | 110 |
| | | | | | |
| Total Consulting & Technology | 296 | | 2,205 | 1,435 | 3,936 |
| | | | | | |
| **Solid Waste:** | | | | | |
| Bankruptcy | | | | | 1,020 |
| Delaware SW- Estimating | | 250 | | | 250 |
| Delaware SW- Poor Sub Perf | | | 500 | | 500 |
| Delaware SW-Engineering Design | | | 515 | | 515 |
| | | | | 650 | 650 |
| ET - Claim | | | 540 | 409 | 982 |
| Out of Scope Work | | 33 | | 138 | 138 |
| Product Failure Warranty | | | | 745 | 745 |
| ET Investment | | | | 220 | 220 |
| Accounts Payable | | | | | |
| Inventory Obsolete | | 30 | 103 | | 133 |
| Total Solid Waste | 0 | 313 | 2,678 | 2,162 | 5,153 |
| | | | | | |
| **International:** | | | | | |
| ST Felicione | | | | 1,700 | 1,700 |
| Biodepp Bankruptcy | | | | 100 | 100 |
| W/Os > 100K | | | | | 50 |
| Billed > 10K < 100K | | | 35 | | 150 |
| Unbilled < 25K | | | 150 | 200 | 200 |
| Docklands | | | 1,000 | 1,000 | 2,000 |
| Fluor Daniel | | | 450 | 450 | 900 |
| OCA Claim | | | | 175 | 175 |
| Doe Run | | | | 50 | 50 |
| Total International | 0 | 0 | 1,635 | 3,675 | 5,325 |
| | | | | | |
| **Trans & Telecom:** | | | | | |
| Bankruptcy | | | 65 | | 65 |
| Nextel | | | 20 | 25 | 45 |
| Federal Highway | | | 50 | 20 | 20 |
| Billed under $10K | | | 97 | 65 | 115 |
| Unbilled | | | 0 | 63 | 160 |
| Unbilled < 25K | | | | 95 | 95 |

8

tralShtRev1.xls
J. Pierson

IT-BOD-008657

12/3/01 6:23 PM

12/3/01 6:23 PM

**The IT Group, Inc.**
**Issues List**
**FYE Dec 28, 2001**

| | $ 000's | | | | Prop. W/Ds | |
| --- | --- | --- | --- | --- | --- | --- |
| | Yrs 98 & prior | 1999 | 2000 | 2001 Total | 2001 Total | 0 |
| Retainage | | | | | | |
| Total Trans & Telecom | 0 | 0 | 232 | 288 | 500 | 500 |
| | | | | | | |
| Equipment Division: | | | | | | |
| Bulldozer maintenance | | | | 700 | 700 | |
| Other equipment write-off | | | 680 | | 680 | |
| Construction equip. (Research) | | | 2,000 | | 2,000 | |
| OHM Vision integration tng | 290 | | | | 290 | |
| Dell note receivable | 200 | | | | 200 | |
| Inventory | | | 500 | 620 | 1,120 | |
| Inventory | | 160 | | | 160 | |
| Carus Chemical | | 115 | | | 115 | |
| Computer issues | | 340 | 340 | | 680 | |
| Furniture & telecom | | 1,510 | | | 1,510 | |
| Obsolete/lost assets | | 355 | | | 355 | |
| IMC Equip. | | | | 500 | 500 | |
| Total equipment division | 490 | 2,480 | 3,500 | 1,820 | 8,260 | |
| | | | | | | |
| Facilities: | | | | | | |
| Year 2000 Special Charge | | | 1,000 | | 1,000 | |
| Year 2001 Special Charge | | | | 3,300 | 3,300 | |
| Total Facilities | 0 | 0 | 1,000 | 3,300 | 4,300 | |
| | | | | | | |
| Corporate: | | | | | | |
| Corporate | | 3,300 | 1,000 | 1,000 | 4,300 | |
| Severance Charge | | | | | 0 | |
| Total Corporate | 0 | 3,300 | 1,000 | 0 | 4,300 | |
| | | | | | | |
| Total Company Wide | 10,228 | 8,066 | 38,282 | 35,625 | 100,101 | |

IT-BOD-008658

BalShtRev1.xls
J. Pierson

A   39

# EXHIBIT B TO SUBPOENA

The IT Group
Detail Projects (Company 00071)
Project Data for Unbilled Balance Analysis

TRUST A0014124

TRUST 0011125
A  43

# EXHIBIT C TO SUBPOENA

THE IT GROUP, INC.
LARGEST CONTRACTS BY BUSINESS LINE
AS OF SEPTEMBER 28, 2001
(in 000's)

| BUSINESS LINE | DESCRIPTION | EXPIRATION DATE | CONTRACTED/ OBLIGATED BACKLOG | IDO/ UNOBLIGATED BACKLOG | TOTAL |
|---|---|---|---|---|---|
| GOVT SERVICES | USACE - SAC TERC II | 6/01/97-6/01/03 | 57,019 | 126,680 | 183,699 |
| | USACE KC TERC | 2/19/98-2/18/00** | 2,203 | 169,992 | 172,195 |
| | NAVY EFA WEST RAC II | 3/01/99-3/01/04 | 87,588 | 83,216 | 170,804 |
| | USACE SAD TERC | 5/17/96-5/17/05* | 50,524 | 119,304 | 169,820 |
| | USACE Fort Benning | 12/00 - 12/05 | 144,000 | - | 144,000 |
| | NAVY - LANTDIV RAC III | 1/22/98-1/21/05 | 21,928 | 115,792 | 137,720 |
| | AFCEE ENRAC | 04/27/01-04/27/0 | 4,350 | 75,768 | 80,118 |
| | USACE Baltimore TERC | 8/16/05-8/16/05* | 24,985 | 38,830 | 63,815 |
| | AFCEE 3P+ A&E | 06/01/00-06/01/10 | 3,938 | 58,371 | 62,309 |
| | USACE-Tulsa TERC | 08/17/84-08/16/0 | 10,574 | 60,352 | 60,926 |
| | NAVY PAC DIV – RAC II | 1/2/99-1/1/06 | 24,916 | 33,976 | 58,892 |
| | USACE Omaha TERC II | 09/30/93-09/30/00 | 1,560 | 55,496 | 57,056 |
| | USEPA ERRS Region III | /06/29/00-10/01/0 | 805 | 55,809 | 56,694 |
| | USEPA -REGION IV | 06/17/99-06/17/0 | 673 | 54,680 | 55,353 |
| CEC | Iron Mountain | 10/00-12/30 | 210,629 | - | 210,629 |
| | El Paso Energy | 03/01-05/04 | 4,500 | 152,000 | 156,500 |
| FORT MEADE OUTSOURCING | Fort Meade | 04/01-04/51 | - | 536,158 | 536,158 |
| | Chesapeake 2000 | 05/00-05/05 | 12,231 | 115,686 | 127,917 |
| | Ft Benning | 03/00-03/05 | 1,621 | 55,191 | 56,812 |
| | MCDC Chesapeake | 08/99-08/04 | 7,567 | 47,343 | 54,910 |
| | N DIV IDIQ Family Housing | 05/00-05/05 | 3,515 | 49,008 | 52,523 |
| CONSULTING | USEPA - OATS | 11/15/00-11/14/0 | 1,274 | 17,987 | 19,261 |
| | | | 676,400 | 2,011,639 | 2,688,119 |
| | | | | | ᵗ 2,688,119 |

** Includes option years

F-4

A   45

ITLCONSEPT01v3
largest cont09301

# Exhibit B

**EXHIBIT "B"**
Signature Page

Dated: February 15, 2006

GLANCY, BINKOW & GOLDBERG LLP
*Counsel for Plaintiffs*

By: ~~Lionel Glancy~~

Lionel Z. Glancy, Esq.
Robert M. Zabb, Esq.
1801 Avenue of the Stars, Suite 311
Los Angeles, California 90067
Telephone:  (310) 201-9150
Facsimile:  (310) 201-9160

Dated: February 15, 2006

LATHAM & WATKINS LLP
*Counsel for Defendants other than Harry Soose and*
*Anthony DeLuca*

By: ~~David A. Becker / lmm~~

Thomas L. Patten, Esq.
Laurie B. Smilan, Esq.
David A. Becker, Esq.
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
Telephone: (202) 637-2200
Facsimile: (202) 637-2201

Dated: February 15, 2006

DICKIE, McCAMEY & CHILCOTE, P.C.
*Counsel for Defendant Harry Soose*

By: ~~Charles A. DeMonaco / lmm~~

Charles A. DeMonaco, Esq.
Richard J. Federowicz, Esq.
Kimberly L. Haddox, Esq.
Two PPG Place, Suite 400
Pittsburgh, PA  15222-5402
Telephone: (412) 281-7272
Facsimile: (412) 392-5367

Dated: February 15, 2006

ECKERT SEAMANS CHERIN & MELLOTT, LLC
*Counsel for Defendant Anthony DeLuca*

By: ~~Mark A. Willard / lmm~~

Mark A. Willard, Esq.
Robert V. Campedel. Esq.
600 Grant Street, 44th Floor
Pittsburgh, PA  15219
Telephone: (412) 566-6000

A    47

# Unreported Cases

Westlaw.

Slip Copy                                                                                              Page 1
Slip Copy, 2006 WL 322606 (W.D.N.C.), 97 A.F.T.R.2d 2006-1265
**(Cite as: Slip Copy)**

Briefs and Other Related Documents

United States District Court,W.D. North Carolina.
Gene Surles CORPENING, Plaintiff,
v.
Larry LEDER, et al., Defendants.
**No. 5:05 CV 24.**

Feb. 9, 2006.

Gene Surles Corpening, Granite Falls, NC, pro se.
Joshua D. Smeltzer, U.S. Dept. of Justice, Washington, DC, for Defendants.

ORDER

VOORHEES, Chief J.

**\*1** THIS MATTER is before the Court on the following motions and memoranda: (1) United States' Motion to Dismiss and Memorandum in Support, both filed April 26, 2005 [Document # 5]; (2) Plaintiff's Motion to Vacate and Strike Motion to Dismiss and Response in Opposition to Defendant's Motion to Dismiss, filed May 19, 2005 [Document # 6]; (3) United States' Response to Plaintiff's Motion to Vacate and Strike Motion to Dismiss, filed May 31, 2005 [Document # 7]; (4) Plaintiff's Reply to Motion to Vacate and Strike Motion to Dismiss, filed June 6, 2005 [Document # 8]; (5) Plaintiff's Motion to Strike and Vacate United States' Motion to Dismiss for Lack of Standing, filed September 12, 2005 [Document # 9]; (6) Plaintiff's Motion for Court to Take Judicial Notice, filed September 12, 2005 [Document # 10]; (7) Affidavit of Plaintiff, filed September 12, 2005 [Document # 11]; (8) Affidavit of Service for Subpoena Duces Tecum, filed October 24, 2005 [Document # 12]; and (9) Plaintiff's Response to United States' Objection to Plaintiff's Subpoena and Plaintiff's Motion to Enforce Subpoena, filed November 15, 2005 [Document # 13]. These Motions are now ripe for disposition by the Court.

Having carefully considered the arguments of the parties, the record, and the applicable authority, the Court will *grant* the United States' Motion to Dismiss, *deny* Plaintiff's Motion to Vacate and Strike United States' Motion to Dismiss, *deny* Plaintiff's Motion to Strike and Vacate United States' Motion to Dismiss for Lack of Standing, *deny* Plaintiff's

Motion for Court to take Judicial Notice, and *deny* Plaintiff's Motion to Enforce Subpoena.

I. FACTUAL AND PROCEDURAL HISTORY

For purposes of this Motion to Dismiss, the Court accepts the following facts derived from Plaintiff's Complaint as true. *See Darcangelo v. Verizon Commc'ns, Inc.,* 292 F.3d 181, 189 (4th Cir.2002) (noting that "at the motion to dismiss stage, a court must accept the allegations in the complaint as true and view the complaint in the light most favorable to the plaintiff").

Plaintiff Gene Surles Corpening ("Plaintiff") is a citizen of the United States and lives in Caldwell County, North Carolina. (Compl.¶ 4). Defendant Larry Leder is an Internal Revenue Service ("IRS") agent and "at all times relevant to this complaint, was presumably employed by the IRS and acting under color of law in his individual capacity." (*Id.* ¶ 5).

On July 7, 2003, pursuant to 26 U.S.C. § 6331, Defendant Leder issued a Notice of Levy to Centura Bank. (*Id.* ¶ 12). On September 19, 2003, Centura Bank complied with the Notice of Levy and turned over $1,417.78 from Plaintiff's bank account to the Internal Revenue Service. (*Id.* ¶ 13, prayer for relief). Moreover, on August 27, 2003, pursuant to 26 U.S.C. § 6331, Defendant issued a Notice of Levy to "E Trade Clearing LLC." (*Id.* ¶ 14). On September 5, 2003, E Trade Clearing LLC complied with the Notice of Levy "issued under color of law" and turned over $2,667.00 from Plaintiff's stock account to the Internal Revenue Service. (*Id.* ¶¶ 14, 15). Additionally, during 2004, First National Bank received a Notice of Levy but did not provide the Internal Revenue Service with funds from Plaintiff's account. (*Id.* ¶ 16).[FN1]

> FN1. Defendant advises the Court that the IRS levied on Plaintiff's bank accounts in order to collect Plaintiff's unpaid income tax liabilities. (Def. Mem. in Supp. of Mot. to Dismiss p. 2). Plaintiff does not dispute the purpose for the levies.

**\*2** Due to Defendant's issuance of the Notices of Levy and the resulting loss of funds from Plaintiff's bank and stock accounts, on February 23, 2005, Plaintiff filed a *pro se*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                                    Page 2
Slip Copy, 2006 WL 322606 (W.D.N.C.), 97 A.F.T.R.2d 2006-1265
**(Cite as: Slip Copy)**

Complaint. Plaintiff's Complaint names Internal Revenue Service Agent Larry Leder in his individual capacity as a defendant. (*Id.* ¶ 5).

Plaintiff alleges four causes of action against Defendant Leder. Plaintiff first brings a claim against Defendant for failing to charge the proper authorities within the IRS to acquire the proper authorization to seize private property, in violation of Plaintiff's Fourth Amendment right to be free from unreasonable seizure. (*Id.* ¶ 18). Plaintiff's second cause of action is also pursuant to the Fourth Amendment, in which he alleges that Defendant violated his right to be free from unreasonable searches and seizures. (*Id.* ¶ 19). Plaintiff further charges Defendant with violating Plaintiff's Fifth and Fourteenth Amendment rights by either physically assisting or assisting others in obtaining Plaintiff's property through the use of a false filing. (*Id.* ¶ 20). Finally, Plaintiff argues that by purposely omitting any reference to 26 U.S.C. § 6331(a) on the Notice of Levy form, Defendant concealed the fact that the pertinent statute applies only to federal employees and not to private citizens. (*Id.* ¶ 21). For these violations, Plaintiff seeks to recover compensatory and punitive damages, as well as attorneys' fees and declaratory relief.[FN2]

> FN2. Evidently Plaintiff believes that he is not subject to paying Federal income taxes because he is not a "citizen of the United States" and does not live in a federal area over which Congress has jurisdiction relative to the Internal Revenue Code. (Pl.Aff.¶¶ 57). However, the law is clear that federal income tax laws are constitutional and apply to all citizens of the United States. *See, e.g., United States v. Gerads,* 999 F.2d 1255, 1256 (8th Cir.1993) (rejecting argument that federal income tax is unconstitutional and voluntary); *United States v. Solan,* 939 F.2d 499, 500-01 (7th Cir.1991) (finding person who claims to be "freeborn, natural individual, a citizen of the State of Indiana" is subject to federal tax code; all individuals must pay federal income tax on their wages).

## II. DISCUSSION

Defendant Leder contends that Plaintiff's Complaint should be dismissed because: (1) Plaintiff improperly named IRS employees as defendants; (2) the United States has not waived sovereign immunity; and (3) Plaintiff's Complaint fails to state a claim upon which relief can be granted.[FN3]

> FN3. Although Plaintiff names Larry Leder and "any and all Does" as defendants, Plaintiff only served the Complaint and Summons on Defendant Leder. Consequently, this matter is dismissed with prejudice against "any and all Does" for failure to prosecute. Fed.R.Civ.P. 4(m).

### A. Defendant's Motion to Dismiss

#### 1. *Standard of review*

The purpose of a Rule 12(b)(6) motion is to test the legal sufficiency of a plaintiff's complaint. *Suarez v. Charlotte-Mecklenburg Schs.,* 123 F.Supp.2d 883, 885-86 (W.D.N.C.2000) (citing *Republican Party of N.C. v. Martin,* 980 F.2d 943, 952 (4th Cir.1992)). In considering a Rule 12(b)(6) motion to dismiss, the court must take the allegations in the complaint as true and construe the facts alleged in the complaint in the light most favorable to the plaintiff. *GE Inv. Private Placement v. Parker,* 247 F.3d 543, 548 (4th Cir.2001); *see also Adams v. Bain,* 697 F.2d 1213, 1219 (4th Cir.1982) (noting that a court must take the facts in the light most favorable to the non-movant in considering a Rule 12(b)(1) motion and the plaintiff is entitled to the same procedural protections he would receive under Rule 12(b)(6)). "[Dismissal may occur] only if it appears beyond doubt that the plaintiff[ ] can prove no set of facts in support of [her] claim that would entitle [her] to relief." *Jackson v. Blue Dolphin Commc'ns of N.C, L.L.C.,* 226 F.Supp.2d 785, 788-89 (W.D.N.C.2002) (brackets in original) (*quoting Flood v. New Hanover County,* 125 F.3d 249, 251 (4th Cir.1997)). Viewing the facts in the light most favorable to the non-movant is especially important when the movant seeks to dismiss a complaint filed by a *pro se* plaintiff. *Suarez,* 123 F.Supp.2d at 886. Since often in a *pro se* case the issues are not clearly articulated, there is a greater burden on the district court to ensure that constitutional deprivations are redressed. *Id.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                                                    Page 3
Slip Copy, 2006 WL 322606 (W.D.N.C.), 97 A.F.T.R.2d 2006-1265
**(Cite as: Slip Copy)**

**\*3** To survive a Rule 12(b)(6) motion, "a complaint need only outline a recognized legal or equitable claim which sufficiently pinpoints the time, place, and circumstances of the alleged occurrence and which, if proven, will justify some form of relief." *Jackson,* 226 F.Supp.2d at 789 (citation omitted). A motion to dismiss is not limited to claims of law which are obviously unsupportable; rather if, as a matter of law, it is obvious that no relief could be granted under any set of facts alleged by the plaintiff, the claim must be dismissed. *Id.* (quoting *Neitzke v. Williams,* 490 U.S. 319, 326-27, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989)). Furthermore, the burden placed on a district court faced with a *pro se* plaintiff is that of "examin[ing] the *pro se* complaint to see whether the facts alleged, or the set of facts which the plaintiff might be able to prove, could very well provide a basis for recovery under any of the civil rights acts or head of jurisdiction in the federal arsenal for redress of constitutional deprivations." *Suarez,* 123 F.Supp.2d at 886.

Significantly, although a court must accept as true all material factual allegations in the complaint, the court does not need to accept a plaintiff's "conclusory allegations regarding the legal effect of the facts alleged." *Labram v. Havel,* 43 F.3d 918, 921 (4th Cir.1995).

### 2. Constitutionality of the levy process

As alleged by Plaintiff, Defendant Leder issued a Notice of Levy to Centura Bank, E Trade Clearing LLC, and First National Bank regarding Plaintiff's bank and stock accounts. Plaintiff maintains that such Notices were fraudulent.[FN4]

> **FN4.** Significantly, Plaintiff did not attach copies of these Notices of Levy to his Complaint.

As clearly stated by the United States Supreme Court:
The levy is a provisional remedy and typically "does not require any judicial intervention" ... The governing statute is § 6331(a).... It authorizes collection of the tax by levy which, by § 6331(b), "includes the power of distraint and seizure by any means." In the situation where a taxpayer's property is held by another, a notice of levy upon the custodian is customarily served pursuant to § 6332(a). This notice gives the IRS the right to all property levied upon, ... and creates a custodial relationship between the person holding the prop-

erty and the IRS so that the property comes into the constructive possession of the Government.... If the custodian honors the levy, he is "discharged from any obligation or liability to the delinquent taxpayer with respect to such property or rights to property arising from such surrender or payment." § 6332(d). If, on the other hand, the custodian refuses to honor a levy, he incurs liability to the Government for his refusal. § 6332(c)(1).... The constitutionality of the levy procedure, of course, "has been long settled."

*United States v. National Bank of Commerce,* 472 U.S. 713, 720-21, 105 S.Ct. 2919, 86 L.Ed.2d 565 (1985). Moreover, "[i]t well established that a bank account is a species of property 'subject to levy,' within the meaning of §§ 6331 and 6332." *Id.* at p. 721. Additionally, the Secretary of the Internal Revenue Service "or his delegate" has the authority to issue levies. 26 U.S.C. §§ 6331, 7701(a)(11)(B). As used here, the phrase "or his delegate" is defined as any officer, employee, or agency of the Treasury Department who is authorized to perform the given duty either directly or indirectly, through one or more re-delegation of authority. 26 U.S.C. § 7701(a)(12).

**\*4** Here, Plaintiff does not allege how the Notices of Levy were fraudulent, other than to state that Defendant Leder issued such Notices without authorization to seize Plaintiff's property. (Compl.¶ 25). However, as admitted to by Plaintiff, Defendant Leder is an IRS employee. *(Id.* ¶ 5). Therefore, Defendant Leder was authorized to issue such Notices of Levy. *See* 26 U.S.C. §§ 6331, 6332, 7701(a)(11)(B), and 7701(a)(12).[FN5]

> **FN5.** Plaintiff further claims that by Defendant Leder purposely omitting any reference to Title 26 U.S.C. § 6331(a) on the reverse side of the Notices of Levy issued in this matter, Defendant concealed the fact that Section 6331(a) only applies to Federal employees and not to private citizens. Plaintiff is incorrect. As clearly stated in Section 6331, "[i]f *any person* liable to pay tax neglects or refuses to pay the same within 10 days after notice and demand, it shall be lawful for the Secretary to collect such tax (and such further sum as shall be sufficient to cover the expenses of the levy) by levy upon all property .... " (emphasis added). There-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                                    Page 4
Slip Copy, 2006 WL 322606 (W.D.N.C.), 97 A.F.T.R.2d 2006-1265
**(Cite as: Slip Copy)**

fore, Section 6331 applies to both private citizens and federal employees.

### 3. Dismissal of claims against Defendant Leder

As noted by Defendant, "[i]t is well settled that the United States is a sovereign, and, as such, is immune from suit unless it has expressly waived such immunity and consented to be sued." *Gilbert v. DaGrossa,* 756 F.2d 1455, 1458 (9th Cir.1985); *see also Skala v. Johnson,* No. 3:98CR173, 1998 WL 681486, at *2 (W.D.N.C.1998) (unpublished) (noting where United States has not waived immunity, dismissal of the suit against the United States is required) (citing *Gilbert,* 756 F.2d at 1458). Moreover, a plaintiff cannot avoid the bar of sovereign immunity by naming officers and employees of the United States as defendants. *Id.*

Here, Plaintiff maintains that this lawsuit is brought against Defendant Leder individually, and not in Defendant's official capacity as an IRS employee. (Pl.Resp. pp. 3-4). Plaintiff argues that Defendant is liable in his individual capacity "under this Bivens (Title 42, § 1983) action." (*Id.* p. 4).

Plaintiff correctly states that government officials can be sued in their individual capacities for violations of a citizen's constitutional rights. *See Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). However, even where a government official is sued in his individual capacity, he may be protected from such suit by qualified immunity. Specifically, where a government official is performing a discretionary function, such official is shielded from liability for civil damages when his conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Qualified immunity protects all government officials unless the law "clearly prohibited" the action taken. *Slattery v. Rizzo,* 939 F.2d 213, 216 (4th Cir.1991). The purpose of qualified immunity is to "remove most civil liability actions, except those where the official clearly broke the law, from the legal process well in advance of the submission of facts to a jury." *Id.*

In the instant case, Plaintiff's Complaint does not allege any facts (as opposed to conclusory allegations) to support the alleged violations by Defendant Leder. Plaintiff merely alleges Defendant violated his rights under several provisions of the United States Constitution. (*See* Compl. ¶¶ 18-21). Plaintiff states that his "Fourth Amendment rights to be free from unreasonable seizure were violated when the said federal actors (Defendants) did not charge the proper authorities within the IRS to acquire the proper authorization to seize private property with probable cause and a judicial determination (due process), and then did not inform and co-ordinate their activities within the law." (*Id.* ¶ 18). Plaintiff further maintains that his "Fourth Amendment rights to be secure in his house, papers, and effects from unreasonable or violent unprovoked attacks, as unreasonable searches and seizures by defendants were violated by each and every Defendants' actions either directly or indirectly." (*Id.* ¶ 19). Moreover, Plaintiff contends that his "Fifth and Fourteenth Amendment rights to due process were violated by Defendant who either physically assisted in this abduction of Plaintiff's personal property or who was assisted by others...." (*Id.* ¶ 20). Additionally, according to Plaintiff, "[b]y purposely omitting any reference to Title 26, U.S.C., [sic] § 6331(a) on the reverse side of the fraudulent IRS Notice of Levy (form 668A(c)), Defendants concealed the fact that Title 26, U.S.C., [sic] § 6331 Levies apply only to Federal Employees and not to private Citizens." (*Id.* ¶ 21).

**\*5** These allegations are all conclusory in nature and Plaintiff's Complaint does not contain facts from which a reasonable person could conclude that Defendant violated a "clearly established" constitutional or statutory right. Therefore, Defendant Leder is entitled to qualified immunity from suit in his individual capacity and Defendant's Motion to Dismiss is *granted.*[FN6]

> FN6. Even if the Court liberally construed Plaintiff's Complaint to state a Section 7433 action for failure of an IRS officer to follow the Internal Revenue Code, such action would also have to be dismissed because Section 7433 requires exhaustion of administrative remedies as a precursor to jurisdiction in this Court. Plaintiff has not presented any evidence that he availed himself of *any* ad-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                                          Page 5
Slip Copy, 2006 WL 322606 (W.D.N.C.), 97 A.F.T.R.2d 2006-1265
**(Cite as: Slip Copy)**

ministrative remedies.

B. Plaintiff's Motion to Vacate and Strike Defendant's Motion to Dismiss

Plaintiff argues that since the United States was not named as a Defendant, counsel for the United States trespassed on the case as an "interloper" and, consequently, the United States' Motion to Dismiss is irrelevant and should be vacated and stricken.

Although Plaintiff did not specifically name the United States as a defendant, he did name IRS employee Larry Leder, Operations Manager of the Automated Collection Service in Philadelphia. Generally speaking, the United States and not its employee is the proper party in suits based on actions taken by an IRS employee. *See Atkinson v. O'Neill,* 867 F.2d 589, 589-90 (10th Cir.1989) (stating that a suit against an official of an agency of the United States for official acts is deemed to be a suit against the United States); *Gilbert v. DaGrossa,* 756 F.2d 1455, 1458 (9th Cir.1985) (same). Although Plaintiff sued Defendant Leder in his individual capacity, since Defendant Leder was acting in his capacity as an IRS employee when executing the Notices of Levy, which constitute the basis for Plaintiff's Complaint, the United States has standing to represent Defendant Leder.

Moreover, since the Court granted Defendant's Motion to Dismiss and for the reasons stated in Section A.3 supra, Plaintiff's Motion to Vacate and Strike Defendant's Motion to Dismiss is *denied.*

C. Plaintiff's Motion to Vacate and Strike Defendant's Motion to Dismiss for Lack of Standing

Plaintiff argues that unless the United States can show: (1) "a delegation of authority from Congress to the Secretary and from the Secretary to the Commissioner on down to the Defendants by position and pay grade which 'expressly' authorizes Defendants to administer and enforce internal revenue laws outside the boundaries of 'the District of Columbia' or within the several 50 union states;" or (2) absent the existence of such authority, "evidence of authority conferred by Congress upon the Department of Justice down

to Counsel by position and pay grade to represent Defendants in their individual capacity when they act outside their scope of authority under color of law," then all pleadings and motions filed by the United States should be stricken and vacated.

However, since the Court granted Defendant's Motion to Dismiss and for the reasons stated in Sections A.3 and B supra, Plaintiff's Motion to Vacate and Strike Defendant's Motion to Dismiss for Lack of Standing is hereby *denied as moot.*

D. Plaintiff's Motion for Court to Take Judicial Notice

*6 Plaintiff asks the Court to take judicial notice of the Exhibits attached to his Motion to Strike and Vacate United States' Motion to Dismiss for Lack of Standing, which includes a copy of 26 C.F.R. § 301.7701-9, 4 U.S.C. § 72, Treasury Order 150-01, and TDO 150-10.

Since this Court granted Defendant's Motion to Dismiss, Plaintiff's Motion for the Court to Take Judicial Notice is *denied as moot.*

E. Plaintiff's Motion to Enforce Subpoena

Plaintiff further asks the Court to enforce a subpoena served by Plaintiff on counsel for the United States. Since this Court granted Defendant's Motion to Dismiss, Plaintiff's Motion to Enforce Subpoena is *denied as moot.*

III. CONCLUSION

IT IS, THEREFORE, ORDERED that the United States' Motion to Dismiss is hereby GRANTED.

IT IS FURTHER ORDERED that Plaintiff's Motion to Vacate and Strike United States' Motion to Dismiss is hereby DENIED.

IT IS FURTHER ORDERED that Plaintiff's Motion to Strike and Vacate United States' Motion to Dismiss for Lack of Standing is hereby DENIED.

IT IS FURTHER ORDERED that Plaintiff's Motion for Court to take Judicial Notice is hereby DENIED AS

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                                        Page 6
Slip Copy, 2006 WL 322606 (W.D.N.C.), 97 A.F.T.R.2d 2006-1265
**(Cite as: Slip Copy)**


MOOT.

IT IS FURTHER ORDERED that Plaintiff's Motion to En-
force Subpoena is hereby DENIED AS MOOT.

W.D.N.C.,2006.
Corpening v. Leder
Slip Copy, 2006 WL 322606 (W.D.N.C.), 97 A.F.T.R.2d
2006-1265

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                    Page 1
Not Reported in F.Supp.2d, 2005 WL 3111972 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois.
UNITED STATES of America, State of Illinois, ex rel. and
Cleveland Tyson, Plaintiffs,
v.
AMERIGROUP ILLINOIS, INC., and Amerigroup Corporation, Defendants.
**No. 02 C 6074.**

Oct. 21, 2005.

Michael I. Behn, Behn & Wyetzner, Michael Charles
Rosenblat, Michael E. Rosenblat, P.C., Paul Joseph Gaynor,
Chaka M. Patterson, David Jamison Adams, Tyree L.
Givens, Illinois Attorney General's Office, Paul Joseph
Gaynor, Chaka M. Patterson, Illinois Attorney General,
Joan Matlack, Putterman & Howard, Marla Helene Swartz,
Michael Keyes Hendershot, Frederick H. Cohen, Chad A.
Blumenfield, David Joel Chizewer, Hillary Levitt Dunn,
Goldberg, Kohn, Bell, Black, Rosenbloom & Moritz, Ltd,
Michele Marion Fox, United States Attorney's Office,
NDIL, William W. Thomas, Futterman & Howard, Chtd .,
Chicago, IL, for Plaintiffs.
Daniel John Voelker, Andrew C. Nordahl, Catherine A.
Miller, Daniel Charles Curth, Hillard M. Sterling, Jeffrey
Lawrence Dorman, Freeborn & Peters, Kellye L. Fabian,
Kirkland & Ellis LLP (Chicago), Michele Marion Fox,
United States Attorney's Office, NDIL, Robert A Barba,
Illinois Attorney General's Office, Chicago, IL, for Defendants.

### MEMORANDUM OPINION AND ORDER
Jeffrey Cole, United States Magistrate Judge.
**\*1** The Illinois Department of Healthcare and Family Services ("HFS"), has moved to quash a subpoena *duces tecum* served on it by the defendants calling for production of emails of three named HFS employees on the ground that compliance with the subpoena would be unduly burdensome-especially given the fact that HFS is not a party to the case.

**I**

### BACKGROUND

#### A

#### The Underlying Complaint

Relator, Cleveland Tyson, filed this *qui tam* suit under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq.* and Illinois Whistleblower Reward and Protection Act ("Illinois Whistleblower Act"). 740 ILCS §§ 175/1 *et seq.* [FN1] The FCA establishes civil penalties for any person who files "a false or fraudulent claim for payment or approval" by the United States government. 31 U.S.C. § 3729(a)(1). The provisions of the IWRPA are similar. 740 ILCS § 175/3. The State of Illinois intervened in the suit on March 2, 2005; the United States was just granted leave to intervene on October 17, 2005.

> FN1. The term, *qui tam,* comes from the Latin expression, *qui tam pro domino rege quam pro se ipso in hac parte sequitur* ("Who brings the action for the King as well as for himself"). *United States ex rel. Mathews v. Bank of Farmington,* 166 F.3d 853, 857 (7th Cir.1999). In a *qui tam* action, a private party, the "relator," brings an action to redress fraud upon the government. *Id.* If the claim is proven, the relator receives a percentage of the recovery ranging, under the current statute, from 10% to 30%. *Id.* at 857-58 (*citing* 31 U.S.C. § 3730(d)). *See Vermont Agency of Natural Resources v. United States ex rel. Stevens,* 529 U.S. 765, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000). The history of the False Claims Act is detailed in *United States ex rel. S. Prawer and Co. v. Fleet Bank of Maine,* 24 F.3d 320, 324 (1st Cir.1994). *See also United States ex rel. Williams v. NAC Corp.,* 931 F.2d 1493, 1496-98 (11th Cir.1991).

The second amended complaint alleged that under its contract with the Illinois Department of Public Aid-now known as HFS-Amerigroup Illinois ("AMG-IL") was required to submit quarterly statements certifying that, to its knowledge, there had been no fraud, abuse, or misconduct on the part of its employees, providers, or representatives. The con-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                    Page 2
Not Reported in F.Supp.2d, 2005 WL 3111972 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

tract defined "abuse" as "a manner of operation that results in excessive or unreasonable costs to the Federal and/or State health care programs." (*Second Amended Complaint,* Ex. A, at 2). The Second Amended Complaint alleges that AMG-IL did not report its limited enrollment practices in its quarterly certifications, which were a precondition to its receiving payment from the federal and state programs involved. This omission allegedly resulted in and constituted false or fraudulent claims for payment in violation of the applicable statutes.

### B

### The Present Discovery Dispute

On July 29, 2005, defendants served a subpoena on HFS, calling for the production of twelve categories of materials. It was the third in a series of substantially similar subpoenas, the first two having been the subject of successful motions to quash by HFS.<sup>FN2</sup> On August 11, 2005, HFS moved to quash the subpoena as to all but two of the categories-Nos. 5 and 11-on three grounds: that service was defective under the plain language of <u>Fed.R.Civ.P. 45(b)(1)</u>; that the documents sought were not relevant; and that the subpoena was unduly burdensome to a non-party under <u>Fed.R.Civ.P. 45(c)(3)(A)(iv)</u>. In the alternative, HFS sought a protective order that no discovery be had aside from discovery bearing on the calculation of damages. Defendants filed their response to HFS's motion on August 18, 2005.

> FN2. The defendants have filed objections to those two prior rulings under <u>Fed.R.Civ.P. 72(a)</u>, which are currently pending before Judge Leinenweber.

I convened a hearing on this matter on August 23rd and 24th of 2005. In those two sessions, lengthy conferences were conducted in open court, and many of the disputed issues relating to the instant motion, as well as to another discovery dispute, were resolved. In the end, the parties were able to reach a voluntary agreement as to all but two of the document categories, Nos. 6 and 7. The resolution of their dispute as to category No. 6 was held in abeyance at my request. Document category No. 7, which relates to the production of emails of HFS personnel, remains in dispute, and it is the category that is presently the subject of HFS's mo-

tion to quash.

**\*2** The defendants have agreed to limit their request to the emails of Lucille Rendok and Kelly Carter, who are currently HFS employees, and Nelly Ryan, a former employee. In addition, the defendants have agreed that HFS may limit the search terms to be used in retrieving the desired emails to: (1) adverse select\*, cherry, pregnan\*, trimester, discriminate\*, and/or continuity of care; combined with (2) some reference to Amerigroup, such as Amerigroup or AMG. HFS-still unhappy with the request-filed its reply brief on September 14, 2005.

HFS maintains that the current version of the subpoena must still be quashed under <u>Rule 45(c)(3)(A)(iv)</u> because the defendants' request is unduly burdensome, and the emails are irrelevant and unlikely to lead to the discovery of admissible evidence. The defendants' position consists largely of the unadorned conclusion that the burden is not undue and that the emails are critical to proving that HFS had knowledge of the claimed illegality, which HFS insists is at least a *pro tanto* defense to the claimed fraud.

### II

### ANALYSIS

### A

### Undue Burden Within The Meaning Of <u>Rule 45(c)(3)(A)(iv)</u> And The Protections Accorded Non-Parties

<u>Rule 45(c)(3)(A)(iv)</u> mandates that a court "shall quash or modify" a subpoena if it "subjects a person to undue burden." The Advisory Committee's Notes to the 1991 amendments to <u>Rule 45</u> make clear that the amendments have "enlarge[d] the protections afforded persons who are required to assist the court by giving information or evidence." The rule "requires the court to protect all persons from undue burden imposed by the use of the subpoena power." *Id.* This is not the discretionary language of Rule 26(c), under which a court "may make any order which justice requires to protect a party or person from ... undue burden...." It is a "command[ ]." *Heidelberg Americas, Inc.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                          Page 3
Not Reported in F.Supp.2d, 2005 WL 3111972 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

*v. Tokyo Kikai Seisakusho, Ltd.*, 333 F.3d 38, 41 (1st Cir.2003).

HFS submits that its system and attendant backup system do not even allow the retrieval of emails for the entire five-year period-2000 through 2004-specified in the subpoena. All that is available, according to HFS, is a year's worth of emails. But even that, HFS argues, would constitute an undue burden on it.

As the party objecting to the document request, HFS must demonstrate that the burden of producing the one year's worth of emails is undue. There must be affirmative and compelling proof. *Ipse dixits* will not suffice. *See Trading Technologies Intern., Inc. v. eSpeed, Inc.*, No. 04 C 5312, 2005 WL 1300778, *1 (N.D.Ill. April 28, 2005)*(Moran, J.); *Semien v. Life Insurance, Co. of North America*, No. 03 C 4795, 2004 WL 1151608, *1 (N.D.Ill. April 21, 2004)*(Kocoras, J.); *In re Sulfuric Acid Antitrust Litigation*, No. 03 C 4576, 2005 WL 2403328, *9 (N.D.Ill. Sept.27, 2005)*(collecting cases). HFS has provided such evidence in the form of the affidavit of a testimonially competent HFS employee. *See Rule 602, Federal Rules of Evidence*.

**B**

**The Evidence In Support Of HFS's Motion Suffices To Carry Its Burden Of Proving That Production Of The One Year's Worth Of Emails Should Not Be Required**

**\*3** In support of its contention that the document request is unduly burdensome, HFS has submitted the affidavit of Donald Perry, the chief of its bureau of information systems. (*Motion of Non-Party HFS to Quash a Subpoena for Documents*, Ex. H). Mr. Perry is familiar with HFS's email systems, as well as procedures for backing up email files and restoring old files. (*Id.,* Ex. H, at ¶ 2). The HFS email system comprises 23 post offices residing on specified servers. Each HFS employee is provided with an individual email account in the post office that is appropriate to their location. (*Id.,* Ex. H, at ¶ 3). The post offices are "backed up" incrementally on a daily basis, while a full back up of all the post offices is performed over the weekend. (*Id.,* Ex. H, at ¶ 4). The daily, incremental backup files are retained for one month; the weekly backup files are retained for one year. (*Id.,* Ex. H, at ¶ 5).

Mr. Perry's affidavit explains what would be involved in retrieving the old email files the defendants have requested. In order to restore an employee's email account, one begins with the data range and the employee's post office. The data range is limited to one year from the current date. Once provided with a data range and post office, HFS's central management service can retrieve the appropriate back up tapes from an off-site storage facility and restore that entire post office to a dedicated server with restricted access. (*Id.,* Ex. H, at ¶ 6). At that point, the individual employee's email messages can be retrieved and analyzed to determine relevance. (*Id.,* Ex. H, at ¶ 7). According to Mr. Perry, however, a post office may only be restored one week at a time; if there are multiple weeks in the data range, the restoration process must be performed in stages. (*Id.,* Ex. H, at ¶ 8). During such a "staged retrieval process," a post office is restored for a period, analyzed, and then deleted to allow the next post office to be restored and analyzed. (*Id.,* Ex. H, at ¶ 9). This stored retrieval process is costly, in terms of expense, equipment, and man-power. (*Id.,* Ex. H, at ¶ 10). For example, a review of one year's worth of an employee's emails would take approximately six weeks. (*Id.,* Ex. H, at ¶ 10).

Significantly, the defendants do not challenge any of Mr. Perry's assertions. This omission, they claimed at oral argument, was the inevitable result of having no familiarity with the internal systems used at HFS. The argument is unpersuasive. The defendants could have sought leave to depose Mr. Perry, and, of course, they could have retained an expert of their own to opine on the validity of Mr. Perry's statements-at least in a general sense. Moreover, Mr. Perry's assessment is confirmed, in the main, by the cases, which have recognized that the task of restoring emails through the use of backup tapes is a "unique burden":

Backup tapes record a "snapshot" of the contents of the computer system at the moment the backup is run. "The data on a backup tape are not organized for retrieval of individual documents or files, but for wholesale, emergency uploading onto a computer system." In case the system "crashes," and all the information created since the previous backup is lost, the contents of the tape can be loaded onto

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                        Page 4
Not Reported in F.Supp.2d, 2005 WL 3111972 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

the system, restoring the lost information. Since crashes presumably occur infrequently, backup tapes need not be as convenient to access as, say, a CD-ROM. At the same time, backup tapes must have the capacity to store large amounts of information since they are relied upon to replace all the information contained on a computer system after a crash. It is understandable, then, that backup tapes sacrifice accessibility for storage capacity, since to have both would be impractical and costly.

*4 *Hagemeyer North America, Inc. v. Gateway Data Sciences Corp.,* 222 F.R.D. 594, 600 (E.D.Wis.2004) (Citations omitted).

This is not to say that undue burden may be presumed simply because electronic evidence is involved. *Zubulake v. UBS Warburg LLC,* 217 F.R.D. 309, 318 (S.D.N.Y.2003). But, in the hierarchy of accessibility, it is clear that electronic data stored on media such as the backup tapes involved here is near the bottom. *Id.* at 319. One of the reasons for the difficulty involved in searching backup tapes is that they store infinitely more information than most other storage media. For example, a CD-ROM's storage capacity is 650 megabytes, the equivalent of 325,000 typewritten pages. Computer networks, on the other hand, create backup data measured in terabytes-1,000,000 megabytes-which is the equivalent of 500 billion typewritten pages. Manual for Complex Litigation (Fourth) § 11.446 (2004) (*cited in Hagemeyer,* 222 F.R.D. at 601).

It is not a decisive answer to say that the defendants have offered pay the costs that might be incurred in retrieving the emails. Expense is but a part of the burden. As Mr. Petty's uncontested affidavit indicates, the process of retrieving the emails also entails the extensive use of equipment and internal man-power. It will take six weeks to restore and review the data of just one of the three individual's email accounts. The entire project, then, will entail eighteen weeks of effort. To be sure, one can imagine the use of three dedicated servers to perform each of the six weeks of restoration work concurrently, but the end result is still eighteen weeks of man-power and eighteen weeks of use of the necessary equipment. That burden, which is undeniably substantial, exists independently of the monetary costs entailed.

The defendants have dealt with the question of undue burden by essentially ignoring its existence. This mode of dealing with potentially dispositive argument is as "pointless" as is ignoring potentially dispositive authority that is contrary to a party's position. *Hill v. Norfolk & Western Ry. Co.,* 814 F.2d 1192, 1198 (7th Cir.1987); *Fred A. Smith Lumber Company v. Edidin,* 845 F.2d 750, 753 (7th Cir.1988). While ignoring the question of burdens, the defendants have not cited not a single case in which a non-party was subjected to the significant burden of restoring electronic data from backup tapes.

### C

### The Significance Of HFS's Non-Party Status

In keeping with the text and purpose of Rule 45(c)(3)(A), it has been consistently held that "non-party status" is a significant factor to be considered in determining whether the burden imposed by a subpoena is undue. *See North Carolina Right to Life, Inc. v. Leake,*-F.R.D.-, 231 F.R.D. 49, 2005 WL 2456982 (D.D.C. Oct.6, 2005); *Wyoming v. U.S. Dept. of Agriculture,* 208 F.R.D. 449, 452 (D.D.C.2002); *In re Automotive Refinishing Paint,* 229 F.R.D. 482, 495 (E.D.Pa.2005). As the First Circuit has explained:
*5 Although discovery is by definition invasive, parties to a law suit must accept its travails as a natural concomitant of modern civil litigation. Non-parties have a different set of expectations. Accordingly, concern for the unwanted burden thrust upon non-parties is a factor entitled to *special weight* in evaluating the balance of competing needs.

*Cusumano v. Microsoft Corp.,* 162 F.3d 708, 717 (1st Cir.1998)(Emphasis added). Here, the "unique burden" of restoring the email records and the "special weight" to be accorded HFS's non-party status combine to require that the defendants' subpoena be quashed under Rule 45(c)(3)(A)(iv).

Instead of focusing on the pivotal question of undue burden, the defendants attempt to demonstrate how relevant-i.e., how important-the emails are to HFS's possible knowledge and approval of the defendants' alleged fraud under the False Claims Act. According to the defendants, HFS was aware of adverse selection and has allowed it to be a general

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F Supp.2d                                                                Page 5
Not Reported in F.Supp.2d, 2005 WL 3111972 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

part of the Medicaid program that it was charged with administering. (*Defendants' Response to Motion of Non-Party HFS,* at 13). As such, the defendants argue that their request for the emails is critical to a "government knowledge" defense under *United States ex rel. Durcholz v. FKW, Inc.,* 189 F.3d 542 (7th Cir.1999).

There, the Seventh Circuit explained that, in order to prove an FCA violation, a relator must "produce evidence that [the defendant] knowingly presented, or caused to be presented, a false or fraudulent claim for payment or approval." *Id.* at 544 (*citing* 31 U.S.C. § 3729(a)(1)). The court described the *mens rea* element as requiring "that the defendant have actual knowledge of (or deliberately ignore or act in reckless disregard of) the truth or falsity of the information presented; no specific intent to defraud is required." 189 F.3d at 544 (Emphasis in original). While the court noted that "[i]nnocent mistakes or negligence are not actionable," it also cautioned that "[w]hat constitutes the offense is not intent to deceive but knowing presentation of a claim that is either fraudulent or simply false." *Id.*

As for the "government knowledge" defense, the court held that: "[i]f the government knows *and approves of* the particulars of a claim for payment before that claim is presented, the presenter cannot be said to have knowingly presented a fraudulent or false claim." *Id.* at 545 (Emphasis added). Despite the seeming clarity of the court's opinion, HFS and the defendants have very different interpretations of the opinion and of the elements of the defense. (*Defendants' Response to Motion of Non-Party HFS,* at 13-14; *Reply Brief of the Non-Party HFS to Defendants' Response,* at 3-5). For the defendants, knowledge, *simpliciter,* is enough. Not surprisingly, HFS contends that there must have been approval by employees who had approval authority, not merely knowledge of what was going on. (*HFS Reply Brief* at 6). For the defendants, this sort of proof is irrelevant since they ignore the approval prong of the Seventh Circuit's opinion.

**\*6** Of course, it would be improper for me to make a determination about the ultimate merits of the controversy regarding the scope of the government knowledge defense since that issue is before Judge Leinenweber in the context of defendant's motion for summary judgment. But that does not mean that some cursory review is inappropriate for lim-

ited purposes. *Compare Von Drake v. National Broadcasting Co., Inc.,* No. 04-CV-0652, 2004 WL 1144142, \*2 (N.D.Tex. Mar. 29, 2004)(cursory review to determine whether defendants have substantial arguments for dismissal); *Pacific Lumber Co. v. National Union Fire Insurance. Co. of Pittsburgh, PA,* 220 F.R.D. 349, 352 (N.D.Cal.2003)(cursory review to determine whether motion will potentially dispose of entire case and whether pending motion can be decided absent additional discovery); *Chrysler Capital Corp. v. Century Power Corp.,* 137 F.R.D. 209, 209-10 (S.D.N.Y.1991)(cursory review to determine whether motion appears to have substantial grounds or does not appear to be without foundation in law); *Aura Lamp & Lighting, Inc. v. International Trading Corp.,* 325 F.3d 903 (7th Cir.2003); *Price v.Code-Alarm,* 73 Fed.Appx. 159, 161, 2003 WL 21750812 (7th Cir.2003); (Although a court of appeals lacked jurisdiction to decide the merits of a case over which there was no jurisdiction, it could nevertheless "take a peek" to see whether to transfer the case to the Federal Circuit or dismiss the appeal); *Philips v. Seiter,* 173 F.3d 609, 611 (7th Cir.1999).

Judge Cudahy was the author of the opinion in *Durcholz.* On the panel were Judges Posner and Rovner. The Court of Appeals' conjunctive phrasing-"if the government knows *and* approves"-would appear to have been purposeful and intended to signal that mere knowledge alone of illegality would not enable those who defraud the government from being able to draw a conjurer's circle around their illegality and insulate themselves from condign punishment. Any other reading would make the conjunctive phrasing superfluous. The defendants have not paused to analyze the matter in any depth; they have merely quoted the text of the opinion. HFS, relying on the identical language quoted by the defendants, stressed the conjunctive phrasing and, in addition, adverted to the doctrine that prohibits, in most cases, estoppel against the government.

The inappropriateness of my deciding the issue presently before Judge Leinenweber is further underscored by the fact that the Relator and the State of Illinois have not briefed the government knowledge issue in connection with the present motion, involving as it does, a non-party. Consequently, any expression of ultimate opinion on the government know-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d, 2005 WL 3111972 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

ledge defense would not only be unfair, but would necessarily be uninformed, as parties with a significant interest in the proper resolution of the question have not had an opportunity to express themselves. *Cf. Adamson v. California,* 332 U.S. 45, 59 (1946) (Frankfurter, J., concurring) ("the judicial process [is] at its best" only when there are "comprehensive briefs and powerful arguments on both sides...."); Brandeis, The Living Law, 10 Ill. L.Rev. 461, 470 (1916)("A judge rarely performs his functions adequately unless the case before him is adequately presented.").

**\*7** On the state of the present record, the following seems beyond debate: the burden on HFS to produce the requested emails is substantial and undue, while the claimed criticality of the emails is anything but certain, given the polar positions on the question by HFS and the defendants and the unresolved nature of the issue of the contours of the government knowledge defense. But even if it be conceded that the emails are "potentially germane" to the that defense, the significant and undue burden on HFS precludes production. *See Heidelberg Americas,* 333 F.3d at 41. In *Heidelberg,* for example, the First Circuit upheld the district court's quashing of a subpoena to a non-party and, in so doing, noted that:

some considerable question exists as to how discovery of the materials would lead to admissible evidence. In other words, the documents are not obviously, and perhaps not even reasonably, calculated to lead to other discoverable materials ... The burden on the non-party ..., by contrast, appears to be significant.

333 F.3d at 41.

Here, too, the subpoena is significantly burdensome, and there is a question as to the claimed criticality of the emails: When the defendants filed their motion for summary judgment in December 2004, they were obviously satisfied that the evidentiary record they had compiled was sufficiently comprehensive and compelling that there were no disputed issues of material fact on the question of the government knowledge defense. In the intervening eleven months, the defendants have been content to rely on the record submitted to the district court. Yet, in this court, they now insist that the emails are indispensable to the defense that they

thought was so straightforward and uncompromising in their favor that they were entitled to judgment as a matter of law under Rule 56. The tension between the current claim in this court that the evidence is so critical that any burden that the non-party HFS must endure is outweighed by the need for the evidence and the position taken in the summary judgment motion is as irreconcilable as it is obvious. In short, while the evidence sought may be relevant, on the present record, the efforts required for its production would be unduly burdensome, especially given HFS's non-party status, and the unresolved issue of the scope of the government knowledge defense.

For the foregoing reasons, the motion of non-party Illinois Department of Healthcare and Family Services to quash the defendants' subpoena [267] as to document category No. 7 is GRANTED.

N.D.Ill.,2005.
U.S. v. Amerigroup Illinois, Inc.
Not Reported in F.Supp.2d, 2005 WL 3111972 (N.D.Ill.)

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3111972 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

Page 1

**H**

Briefs and Other Related Documents

Only the Westlaw citation is currently available.

United States District Court,N.D. Illinois.

UNITED STATES of America, State of Illinois, ex rel., and Cleveland Tyson, Plaintiffs,

v.

AMERIGROUP ILLINOIS, INC., and Amerigroup Corporation, Defendants.

No. 02 C 6074.

Oct. 21, 2005.

Michael I. Behn, Behn & Wyetzner, Michael Charles Rosenblat, Michael E. Rosenblat, P.C., Paul Joseph Gaynor, Chaka M. Patterson, David Jamison Adams, Tyree L. Givens, Illinois Attorney General's Office, Paul Joseph Gaynor, Chaka M. Patterson, Illinois Attorney General, Joan Matlack, Putterman & Howard, Marla Helene Swartz, Michael Keyes Hendershot, Frederick H. Cohen, Chad A. Blumenfield, David Joel Chizewer, Hillary Levitt Dunn, Goldberg, Kohn, Bell, Black, Rosenbloom & Moritz, Ltd, Michele Marion Fox, United States Attorney's Office, NDIL, William W. Thomas, Futterman & Howard, Chtd ., Chicago, IL, for Plaintiffs.

Daniel John Voelker, Andrew C. Nordahl, Catherine A. Miller, Daniel Charles Curth, Hillard M. Sterling, Jeffrey Lawrence Dorman, Freeborn & Peters, Kellye L. Fabian, Kirkland & Ellis LLP (Chicago), Michele Marion Fox, United States Attorney's Office, NDIL, Robert A Barba, Illinois Attorney General's Office, Chicago, IL, for Defendants.

*MEMORANDUM OPINION AND ORDER*

Jeffrey Cole, United States Magistrate Judge.

*1 The Illinois Department of Healthcare and Family Services ("HFS"), has moved to quash a subpoena *duces tecum* served on it by the defendants calling for production of emails of three named HFS employees on the ground that compliance with the subpoena would be unduly burdensome-especially given the fact that HFS is not a party to the case.

**I**

**BACKGROUND**

**A**

**The Underlying Complaint**

Relator, Cleveland Tyson, filed this *qui tam* suit under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729 et seq. and Illinois Whistleblower Reward and Protection Act ("Illinois Whistleblower Act"). 740 ILCS §§ 175/1 et seq. FN1 The FCA establishes civil penalties for any person who files "a false or fraudulent claim for payment or approval" by the United States government. 31 U.S.C. § 3729(a)(1). The provisions of the IWRPA are similar. 740 ILCS § 175/3. The State of Illinois intervened in the suit on March 2, 2005; the United States was just granted leave to intervene on October 17, 2005.

> FN1. The term, *qui tam,* comes from the Latin expression, *qui tam pro domino rege quam pro se ipso in hac parte sequitur* ("Who brings the action for the King as well as for himself"). *United States ex rel. Mathews v. Bank of Farmington,* 166 F.3d 853, 857 (7th Cir.1999). In a *qui tam* action, a private party, the "relator," brings an action to redress fraud upon the government. *Id.* If the claim is proven, the relator receives a percentage of the recovery ranging, under the current statute, from 10% to 30%. *Id.* at 857-58 (*citing* 31 U.S.C. § 3730(d)). *See Vermont Agency of Natural Resources v. United States ex rel. Stevens,* 529 U.S. 765, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000). The history of the False Claims Act is detailed in *United States ex rel. S. Prawer and Co. v. Fleet Bank of Maine,* 24 F.3d 320, 324 (1st Cir.1994). *See also United States ex rel. Williams v. NAC Corp.,* 931 F.2d 1493, 1496-98 (11th Cir.1991).

The second amended complaint alleged that under its contract with the Illinois Department of Public Aid-now known as HFS-Amerigroup Illinois ("AMG-IL") was required to submit quarterly statements certifying that, to its knowledge, there had been no fraud, abuse, or misconduct on the part of its employees, providers, or representatives. The con-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                            Page 2
Not Reported in F.Supp.2d, 2005 WL 3111972 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

tract defined "abuse" as "a manner of operation that results in excessive or unreasonable costs to the Federal and/or State health care programs." (*Second Amended Complaint,* Ex. A, at 2). The Second Amended Complaint alleges that AMG-IL did not report its limited enrollment practices in its quarterly certifications, which were a precondition to its receiving payment from the federal and state programs involved. This omission allegedly resulted in and constituted false or fraudulent claims for payment in violation of the applicable statutes.

### B

### The Present Discovery Dispute

On July 29, 2005, defendants served a subpoena on HFS, calling for the production of twelve categories of materials. It was the third in a series of substantially similar subpoenas, the first two having been the subject of successful motions to quash by HFS.[FN2] On August 11, 2005, HFS moved to quash the subpoena as to all but two of the categories-Nos. 5 and 11-on three grounds: that service was defective under the plain language of Fed.R.Civ.P. 45(b)(1); that the documents sought were not relevant; and that the subpoena was unduly burdensome to a non-party under Fed.R.Civ.P. 45(c)(3)(A)(iv). In the alternative, HFS sought a protective order that no discovery be had aside from discovery bearing on the calculation of damages. Defendants filed their response to HFS's motion on August 18, 2005.

> FN2. The defendants have filed objections to those two prior rulings under Fed.R.Civ.P. 72(a), which are currently pending before Judge Leinenweber.

I convened a hearing on this matter on August 23rd and 24th of 2005. In those two sessions, lengthy conferences were conducted in open court, and many of the disputed issues relating to the instant motion, as well as to another discovery dispute, were resolved. In the end, the parties were able to reach a voluntary agreement as to all but two of the document categories, Nos. 6 and 7. The resolution of their dispute as to category No. 6 was held in abeyance at my request. Document category No. 7, which relates to the production of emails of HFS personnel, remains in dispute, and it is the category that is presently the subject of HFS's mo-

tion to quash.

**\*2** The defendants have agreed to limit their request to the emails of Lucille Rendok and Kelly Carter, who are currently HFS employees, and Nelly Ryan, a former employee. In addition, the defendants have agreed that HFS may limit the search terms to be used in retrieving the desired emails to: (1) adverse select\*, cherry, pregnan\*, trimester, discriminate\*, and/or continuity of care; combined with (2) some reference to Amerigroup, such as Amerigroup or AMG. HFS-still unhappy with the request-filed its reply brief on September 14, 2005.

HFS maintains that the current version of the subpoena must still be quashed under Rule 45(c)(3)(A)(iv) because the defendants' request is unduly burdensome, and the emails are irrelevant and unlikely to lead to the discovery of admissible evidence. The defendants' position consists largely of the unadorned conclusion that the burden is not undue and that the emails are critical to proving that HFS had knowledge of the claimed illegality, which HFS insists is at least a *pro tanto* defense to the claimed fraud.

### II

### ANALYSIS

### A

### Undue Burden Within The Meaning Of Rule 45(c)(3)(A)(iv) And The Protections Accorded Non-Parties

Rule 45(c)(3)(A)(iv) mandates that a court "shall quash or modify" a subpoena if it "subjects a person to undue burden." The Advisory Committee's Notes to the 1991 amendments to Rule 45 make clear that the amendments have "enlarge[d] the protections afforded persons who are required to assist the court by giving information or evidence." The rule "requires the court to protect all persons from undue burden imposed by the use of the subpoena power." *Id.* This is not the discretionary language of Rule 26(c), under which a court "may make any order which justice requires to protect a party or person from ... undue burden...." It is a "command[ ]." *Heidelberg Americas, Inc.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                    Page 3
Not Reported in F.Supp.2d, 2005 WL 3111972 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

_v. Tokyo Kikai Seisakusho, Ltd., 333 F.3d 38, 41 (1st Cir.2003)._

HFS submits that its system and attendant backup system do not even allow the retrieval of emails for the entire five-year period-2000 through 2004-specified in the subpoena. All that is available, according to HFS, is a year's worth of emails. But even that, HFS argues, would constitute an undue burden on it.

As the party objecting to the document request, HFS must demonstrate that the burden of producing the one year's worth of emails is undue. There must be affirmative and compelling proof. _Ipse dixits_ will not suffice. _See Trading Technologies Intern., Inc. v. eSpeed, Inc.,_ No. 04 C 5312, 2005 WL 1300778, *1 (N.D.Ill. April 28, 2005)(Moran, J.); _Semien v. Life Insurance. Co. of North America,_ No. 03 C 4795, 2004 WL 1151608, *1 (N.D.Ill. April 21, 2004)(Kocoras, J.); _In re Sulfuric Acid Antitrust Litigation,_ No. 03 C 4576, 2005 WL 2403328, *9 (N.D.Ill. Sept.27, 2005)(collecting cases). HFS has provided such evidence in the form of the affidavit of a testimonially competent HFS employee. _See Rule 602, Federal Rules of Evidence._

**B**

**The Evidence In Support Of HFS's Motion Suffices To Carry Its Burden Of Proving That Production Of The One Year's Worth Of Emails Should Not Be Required**

**\*3** In support of its contention that the document request is unduly burdensome, HFS has submitted the affidavit of Donald Perry, the chief of its bureau of information systems. (_Motion of Non-Party HFS to Quash a Subpoena for Documents,_ Ex. H). Mr. Perry is familiar with HFS's email systems, as well as procedures for backing up email files and restoring old files. (_Id.,_ Ex. H, at ¶ 2). The HFS email system comprises 23 post offices residing on specified servers. Each HFS employee is provided with an individual email account in the post office that is appropriate to their location. (_Id.,_ Ex. H, at ¶ 3). The post offices are "backed up" incrementally on a daily basis, while a full back up of all the post offices is performed over the weekend. (_Id.,_ Ex. H, at ¶ 4). The daily, incremental backup files are retained for one month; the weekly backup files are retained for one

year. (_Id.,_ Ex. H, at ¶ 5).

Mr. Perry's affidavit explains what would be involved in retrieving the old email files the defendants have requested. In order to restore an employee's email account, one begins with the data range and the employee's post office. The data range is limited to one year from the current date. Once provided with a data range and post office, HFS's central management service can retrieve the appropriate back up tapes from an off-site storage facility and restore that entire post office to a dedicated server with restricted access. (_Id.,_ Ex. H, at ¶ 6). At that point, the individual employee's email messages can be retrieved and analyzed to determine relevance. (_Id.,_ Ex. H, at ¶ 7). According to Mr. Perry, however, a post office may only be restored one week at a time; if there are multiple weeks in the data range, the restoration process must be performed in stages. (_Id.,_ Ex. H, at ¶ 8). During such a "staged retrieval process," a post office is restored for a period, analyzed, and then deleted to allow the next post office to be restored and analyzed. (_Id.,_ Ex. H, at ¶ 9). This stored retrieval process is costly, in terms of expense, equipment, and man-power. (_Id.,_ Ex. H, at ¶ 10). For example, a review of one year's worth of an employee's emails would take approximately six weeks. (_Id.,_ Ex. H, at ¶ 10).

Significantly, the defendants do not challenge any of Mr. Perry's assertions. This omission, they claimed at oral argument, was the inevitable result of having no familiarity with the internal systems used at HFS. The argument is unpersuasive. The defendants could have sought leave to depose Mr. Perry, and, of course, they could have retained an expert of their own to opine on the validity of Mr. Perry's statements-at least in a general sense. Moreover, Mr. Perry's assessment is confirmed, in the main, by the cases, which have recognized that the task of restoring emails through the use of backup tapes is a "unique burden":

Backup tapes record a "snapshot" of the contents of the computer system at the moment the backup is run. "The data on a backup tape are not organized for retrieval of individual documents or files, but for wholesale, emergency uploading onto a computer system." In case the system "crashes," and all the information created since the previous backup is lost, the contents of the tape can be loaded onto

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

the system, restoring the lost information. Since crashes presumably occur infrequently, backup tapes need not be as convenient to access as, say, a CD-ROM. At the same time, backup tapes must have the capacity to store large amounts of information since they are relied upon to replace all the information contained on a computer system after a crash. It is understandable, then, that backup tapes sacrifice accessibility for storage capacity, since to have both would be impractical and costly.

*4 *Hagemeyer North America, Inc. v. Gateway Data Sciences Corp.*, 222 F.R.D. 594, 600 (E.D.Wis.2004) (Citations omitted).

This is not to say that undue burden may be presumed simply because electronic evidence is involved. *Zubulake v. UBS Warburg LLC*, 217 F.R.D. 309, 318 (S.D.N.Y.2003). But, in the hierarchy of accessibility, it is clear that electronic data stored on media such as the backup tapes involved here is near the bottom. *Id.* at 319. One of the reasons for the difficulty involved in searching backup tapes is that they store infinitely more information than most other storage media. For example, a CD-ROM's storage capacity is 650 megabytes, the equivalent of 325,000 typewritten pages. Computer networks, on the other hand, create backup data measured in terabytes-1,000,000 megabytes-which is the equivalent of 500 billion typewritten pages. Manual for Complex Litigation (Fourth) § 11.446 (2004) (*cited in Hagemeyer*, 222 F.R.D. at 601).

It is not a decisive answer to say that the defendants have offered pay the costs that might be incurred in retrieving the emails. Expense is but a part of the burden. As Mr. Petty's uncontested affidavit indicates, the process of retrieving the emails also entails the extensive use of equipment and internal man-power. It will take six weeks to restore and review the data of just one of the three individual's email accounts. The entire project, then, will entail eighteen weeks of effort. To be sure, one can imagine the use of three dedicated servers to perform each of the six weeks of restoration work concurrently, but the end result is still eighteen weeks of man-power and eighteen weeks of use of the necessary equipment. That burden, which is undeniably substantial, exists independently of the monetary costs entailed.

The defendants have dealt with the question of undue burden by essentially ignoring its existence. This mode of dealing with potentially dispositive argument is as "pointless" as is ignoring potentially dispositive authority that is contrary to a party's position. *Hill v. Norfolk & Western Ry. Co.*, 814 F.2d 1192, 1198 (7th Cir.1987); *Fred A. Smith Lumber Company v. Edidin*, 845 F.2d 750, 753 (7th Cir.1988). While ignoring the question of burdens, the defendants have not cited not a single case in which a non-party was subjected to the significant burden of restoring electronic data from backup tapes.

**C**

**The Significance Of HFS's Non-Party Status**

In keeping with the text and purpose of Rule 45(c)(3)(A), it has been consistently held that "non-party status" is a significant factor to be considered in determining whether the burden imposed by a subpoena is undue. *See North Carolina Right to Life, Inc. v. Leake*,-F.R.D.-, 231 F.R.D. 49, 2005 WL 2456982 (D.D.C. Oct.6, 2005); *Wyoming v. U.S. Dept. of Agriculture*, 208 F.R.D. 449, 452 (D.D.C.2002); *In re Automotive Refinishing Paint*, 229 F.R.D. 482, 495 (E.D.Pa.2005). As the First Circuit has explained:
*5 Although discovery is by definition invasive, parties to a law suit must accept its travails as a natural concomitant of modern civil litigation. Non-parties have a different set of expectations. Accordingly, concern for the unwanted burden thrust upon non-parties is a factor entitled to *special weight* in evaluating the balance of competing needs.

*Cusumano v. Microsoft Corp.*, 162 F.3d 708, 717 (1st Cir.1998)(Emphasis added). Here, the "unique burden" of restoring the email records and the "special weight" to be accorded HFS's non-party status combine to require that the defendants' subpoena be quashed under Rule 45(c)(3)(A)(iv).

Instead of focusing on the pivotal question of undue burden, the defendants attempt to demonstrate how relevant-i.e., how important-the emails are to HFS's possible knowledge and approval of the defendants' alleged fraud under the False Claims Act. According to the defendants, HFS was aware of adverse selection and has allowed it to be a general

Westlaw.

Not Reported in F.Supp.2d                                                                              Page 5
Not Reported in F.Supp.2d, 2005 WL 3111972 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

part of the Medicaid program that it was charged with ad-
ministering. (*Defendants' Response to Motion of Non-Party
HFS*, at 13). As such, the defendants argue that their request
for the emails is critical to a "government knowledge" de-
fense under *United States ex rel. Durcholz v. FKW, Inc.*,
189 F.3d 542 (7th Cir.1999).

There, the Seventh Circuit explained that, in order to prove
an FCA violation, a relator must "produce evidence that [the
defendant] knowingly presented, or caused to be presented,
a false or fraudulent claim for payment or approval." *Id.* at
544 (*citing* 31 U.S.C. § 3729(a)(1)). The court described the
*mens rea* element as requiring "that the defendant have actu-
al knowledge of (or deliberately ignore or act in reckless
disregard of) the truth or falsity of the information presen-
ted; no specific intent to defraud is required." 189 F.3d at
544 (Emphasis in original). While the court noted that
"[i]nnocent mistakes or negligence are not actionable," it
also cautioned that "[w]hat constitutes the offense is not in-
tent to deceive but knowing presentation of a claim that is
either fraudulent or simply false." *Id.*

As for the "government knowledge" defense, the court held
that: "[i]f the government knows *and approves of* the partic-
ulars of a claim for payment before that claim is presented,
the presenter cannot be said to have knowingly presented a
fraudulent or false claim." *Id.* at 545 (Emphasis added).
Despite the seeming clarity of the court's opinion, HFS and
the defendants have very different interpretations of the
opinion and of the elements of the defense. (*Defendants' Re-
sponse to Motion of Non-Party HFS*, at 13-14; *Reply Brief
of the Non-Party HFS to Defendants' Response,* at 3-5). For
the defendants, knowledge, *simpliciter,* is enough. Not sur-
prisingly, HFS contends that there must have been approval
by employees who had approval authority, not merely
knowledge of what was going on. (*HFS Reply Brief* at 6).
For the defendants, this sort of proof is irrelevant since they
ignore the approval prong of the Seventh Circuit's opinion.

**\*6** Of course, it would be improper for me to make a de-
termination about the ultimate merits of the controversy re-
garding the scope of the government knowledge defense
since that issue is before Judge Leinenweber in the context
of defendant's motion for summary judgment. But that does
not mean that some cursory review is inappropriate for lim-

ited purposes. *Compare Von Drake v. National Broadcast-
ing Co., Inc.,* No. 04-CV-0652, 2004 WL 1144142, \*2
(N.D.Tex. Mar. 29, 2004)(cursory review to determine
whether defendants have substantial arguments for dis-
missal); *Pacific Lumber Co. v. National Union Fire Insur-
ance. Co. of Pittsburgh, PA,* 220 F.R.D. 349, 352
(N.D.Cal.2003)(cursory review to determine whether mo-
tion will potentially dispose of entire case and whether
pending motion can be decided absent additional discov-
ery); *Chrysler Capital Corp. v. Century Power Corp.,* 137
F.R.D. 209, 209-10 (S.D.N.Y.1991)(cursory review to de-
termine whether motion appears to have substantial grounds
or does not appear to be without foundation in law); *Aura
Lamp & Lighting, Inc. v. International Trading Corp.,* 325
F.3d 903 (7th Cir.2003); *Price v.Code-Alarm,* 73 Fed.Appx.
159, 161, 2003 WL 21750812 (7th Cir.2003); (Although a
court of appeals lacked jurisdiction to decide the merits of a
case over which there was no jurisdiction, it could neverthe-
less "take a peek" to see whether to transfer the case to the
Federal Circuit or dismiss the appeal); *Philips v. Seiter,* 173
F.3d 609, 611 (7th Cir.1999).

Judge Cudahy was the author of the opinion in *Durcholz.*
On the panel were Judges Posner and Rovner. The Court of
Appeals' conjunctive phrasing-"if the government knows
*and approves*"-would appear to have been purposeful and
intended to signal that mere knowledge alone of illegality
would not enable those who defraud the government from
being able to draw a conjurer's circle around their illegality
and insulate themselves from condign punishment. Any oth-
er reading would make the conjunctive phrasing superflu-
ous. The defendants have not paused to analyze the matter
in any depth; they have merely quoted the text of the opin-
ion. HFS, relying on the identical language quoted by the
defendants, stressed the conjunctive phrasing and, in addi-
tion, adverted to the doctrine that prohibits, in most cases,
estoppel against the government.

The inappropriateness of my deciding the issue presently
before Judge Leinenweber is further underscored by the fact
that the Relator and the State of Illinois have not briefed the
government knowledge issue in connection with the present
motion, involving as it does, a non-party. Consequently, any
expression of ultimate opinion on the government know-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                    Page 6
Not Reported in F.Supp.2d, 2005 WL 3111972 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

ledge defense would not only be unfair, but would necessarily be uninformed, as parties with a significant interest in the proper resolution of the question have not had an opportunity to express themselves. *Cf. Adamson v. California,* 332 U.S. 45, 59 (1946) (Frankfurter, J., concurring) ("the judicial process [is] at its best" only when there are "comprehensive briefs and powerful arguments on both sides...."); Brandeis, The Living Law, 10 Ill. L.Rev. 461, 470 (1916)("A judge rarely performs his functions adequately unless the case before him is adequately presented.").

**\*7** On the state of the present record, the following seems beyond debate: the burden on HFS to produce the requested emails is substantial and undue, while the claimed criticality of the emails is anything but certain, given the polar positions on the question by HFS and the defendants and the unresolved nature of the issue of the contours of the government knowledge defense. But even if it be conceded that the emails are "potentially germane" to that defense, the significant and undue burden on HFS precludes production. *See Heidelberg Americas,* 333 F.3d at 41. In *Heidelberg,* for example, the First Circuit upheld the district court's quashing of a subpoena to a non-party and, in so doing, noted that:

some considerable question exists as to how discovery of the materials would lead to admissible evidence. In other words, the documents are not obviously, and perhaps not even reasonably, calculated to lead to other discoverable materials ... The burden on the non-party ..., by contrast, appears to be significant.

333 F.3d at 41.

Here, too, the subpoena is significantly burdensome, and there is a question as to the claimed criticality of the emails: When the defendants filed their motion for summary judgment in December 2004, they were obviously satisfied that the evidentiary record they had compiled was sufficiently comprehensive and compelling that there were no disputed issues of material fact on the question of the government knowledge defense. In the intervening eleven months, the defendants have been content to rely on the record submitted to the district court. Yet, in this court, they now insist that the emails are indispensable to the defense that they

thought was so straightforward and uncompromising in their favor that they were entitled to judgment as a matter of law under Rule 56. The tension between the current claim in this court that the evidence is so critical that any burden that the non-party HFS must endure is outweighed by the need for the evidence and the position taken in the summary judgment motion is as irreconcilable as it is obvious. In short, while the evidence sought may be relevant, on the present record, the efforts required for its production would be unduly burdensome, especially given HFS's non-party status, and the unresolved issue of the scope of the government knowledge defense.

For the foregoing reasons, the motion of non-party Illinois Department of Healthcare and Family Services to quash the defendants' subpoena [267] as to document category No. 7 is GRANTED.

N.D.Ill.,2005.
U.S. v. Amerigroup Illinois, Inc.
Not Reported in F.Supp.2d, 2005 WL 3111972 (N.D.Ill.)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## CERTIFICATE OF SERVICE

I, Eric M. Sutty, Esquire, hereby certify that on this 29th day of June, 2006, I caused copies of the foregoing **Reply Brief in Support of the Motion of the Trustee of The IT Litigation Trust to Quash Subpoena** to be served upon the following parties in the manner indicated:

**VIA ELECTRONIC MAIL AND HAND DELIVERY**

Brian D. Long, Esquire
Milberg, Weiss, Bershad & Schulman
919 North Market Street
Suite 980
Wilmington, DE 19801
Email: blong@milbergweiss.com

Marcos A. Ramos, Esquire
Mark D. Collins, Esquire
Richards, Layton & Finger, PA
One Rodney Square, P.O. Box 551
Wilmington, DE 19899
Email: ramos@rlf.com
Email: collings@rlf.com

Ronald S. Gellert, Esquire
Eckert, Seamans, Cherin & Mellot, LLC
The Towne Center
4 East 8th Street, Suite 200
Wilmington, DE 19801
Email: rgellert@eckertseamans.com

A. Zachary Naylor, Esquire
Chimicles & Tikellis, LLP
One Rodney Square
P.O. Box 1035
Wilmington, DE 19899
Email: zacharynaylor@chimicles.com

Roger D. Anderson, Esquire
Smith, Katzenstein & Furlow LLP
800 Delaware Avenue, P.O. Box 410
Wilmington, DE 19899-0410
Email: randerson@skfdelaware.com

**VIA ELECTRONIC MAIL AND FIRST CLASS MAIL**

Kwasi A. Asiedu, Esquire
Law Offices of Kwasi A. Asiedu
3858 Carson Street
Number 204
Torrance, CA 90503
Email: laskido@hotmail.com

Lionel Z. Glancy, Esquire
Michael Goldberg, Esquire
Robert Zabb, Esquire
Glancy & Binkow
1801 Avenue of the Stars
Suite 311
Los Angeles, CA 90067
Email: info@glancylaw.com

Richard J. Pocker, Esquire
Boies, Schiller & Flexner
777 North Rainbow Boulevard
Suite 350
Las Vegas, NV 89107
Email: rpocker@bsfllp.com

Mark A. Willard, Esquire
Robert V. Campedel, Esquire
Eckert, Seamans, Cherin & Mellott
600 Grant Street, 44th Floor
Pittsburgh, PA 15219
Email: mwillard@eckertseamans.com
Email: rcampedel@eckertseamans.com

629073v1

Charles A. DeMonaco, Esquire
Kimberly L. Haddox, Esquire
Richard J. Federowicz, Esquire
Dickie, McCamey & Chilcote
Two PPG Place, Suite 400
Pittsburgh, PA 15222-5402
Email: cdemonaco@dmclaw.com
Email: khaddox@dmclaw.com
Email: rfederowicz@dmclaw.com

E. Powell Miller, Esquire
Miller Shea
950 West University Drive
Suite 300
Rochester, MI 48307
Email: epm@millershea.com

Steven A. Schwartz, Esquire
Chimicles & Tikellis , Esquire
361 West Lancaster Avenue
One Haverford Centre
Haverford, PA 19041
Email: steveschwartz@chimicles.com

Larry K. Elliott, Esquire
Cohen & Grigsby
11 Stanwix Street, 15th Floor
Pittsburgh, PA 15222-1319
Email: lelliott@cohenlaw.com

David A. Becker, Esquire
Thomas L. Patten , Esquire
Courtney S. Schorr, Esquire
Laurie B. Smilan, Esquire
Latham & Watkins
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
Email: david.becker@lw.com
Email: tom.patten@lw.com
Email: courtney.schorr@lw.com
Email: laurie.smilan@lw.com

Eric M. Sutty (No. 4007)